**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------- x
In re:                                                    :    Chapter 11
                                                          :
BIND THERAPEUTICS, INC., *et al.*,[1]                     :    Case No. 16-_____ (_____)
                                                          :
                    Debtors.                              :    (Joint Administration Requested)
-------------------------------------------------------- x

**DECLARATION OF ANDREW HIRSCH, PRESIDENT AND CHIEF EXECUTIVE
OFFICER OF BIND THERAPEUTICS, INC., IN SUPPORT
OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Under 28 U.S.C. § 1764, Andrew Hirsch declares as follows under the penalty of perjury:

1.      I am the President and Chief Executive Officer of BIND Therapeutics, Inc., a Delaware corporation ("**BIND**"), which is the parent corporation of BIND Biosciences Security Corporation, a Massachusetts security corporation ("**BIND Security**" and, together with BIND, the "**Debtors**"), the other debtor and debtor-in-possession in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**").  I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtors.

2.      I have served as President and Chief Executive Officer of BIND since March 10, 2015.  I have also served as President, Secretary, and Treasurer of BIND Security since March 27, 2015.  In these roles, I am responsible for overseeing the operations and financial activities of the Debtors, including but not limited to, monitoring cash flow, business relationships, workforce issues, and financial planning.  As a result of my tenure with the Debtors, my review of public and non-public documents, and my discussions with other members of the Debtors' management team, I am generally familiar with the Debtors' businesses, financial condition, policies and

---

[1]      The Debtors, together with the last four digits of each Debtor's U.S. federal tax identification number, are: BIND Therapeutics, Inc. (6148) and BIND Biosciences Security Corporation (3208).  The address for the Debtors is 325 Vassar Street, Cambridge, MA 02139.

procedures, day-to-day operations, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisers that report to me in the ordinary course of my responsibilities.  I am authorized by each of the Debtors to submit this First Day Declaration. References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel.  If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.     On May 1, 2016 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "**Court**").  The Debtors will continue to operate their businesses and manage their properties as debtors in possession.

4.     BIND (RUS), LLC, a Russian limited liability company ("**BIND Russia**"), is a wholly owned subsidiary of BIND.  BIND and BIND Russia are parties to that certain Services Agreement, dated as of January 1, 2015, pursuant to which BIND engaged BIND Russia to provide certain research and development services.  On April 20, 2016, BIND Russia began to wind down its operations.  While BIND Russia currently has 11 employees, on April 20, 2016, in connection with the wind down process, eight of the 11 employees were given two months' notice of their termination.  However, BIND Russia is not a chapter 11 debtor and will not be subject to the requirements of title 11 of the United States Code, 11 U.S.C. § 101 *et. seq.*, as amended (the "**Bankruptcy Code**").[2]

---

[2]     The Debtors contemplate that BIND Russia may need additional funds from the Debtors to complete their wind down.  Such amounts are reflected in the Debtors' Budget (as defined in the *Motion of Debtors for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 (I) Authorizing Use of Cash Collateral, (II)*

5.      I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief that were filed under chapter 11 of the Bankruptcy Code and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "**First Day Pleadings**").[3]  The Debtors seek the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the Chapter 11 Cases on their businesses. I have reviewed the Debtors' petitions and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses and to successfully maximize the value of the Debtors' estates.

6.      Part I of this First Day Declaration provides an overview of the Debtors' businesses, organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtors' financial performance and the events leading to the Debtors' chapter 11 filings.  Part II sets forth the relevant facts in support of the First Day Pleadings.

## PART I

## I.     COMPANY AND BUSINESS OVERVIEW

### A.     Overview of Operations

7.      BIND is a biotechnology company developing novel targeted therapeutics, primarily for the treatment of cancer.  Its product candidates are based on proprietary polymeric nanoparticles called ACCURINS®, polymeric nanoparticles that incorporate therapeutic payloads with diverse physical and chemical properties, provide prolonged circulation within the bloodstream, enable targeting of the diseased tissue or cells, and provide for the controlled and

---

*Granting Adequate Protection, (III) Scheduling a Final Hearing and (IV) Granting Related Relief*, filed concurrently herewith).

[3]      Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Pleadings.

3

timely release of the therapeutic payload.   ACCURINS® have the potential to achieve therapeutic outcomes not currently possible with conventional treatment modalities.   BIND is developing ACCURINS® with three different therapeutic objectives, both through internal research programs and with collaborators: (i) innovative medicines – designing new therapeutic approaches by combining novel targeting methods and new classes of therapeutic payloads; (ii) enabling potent pathway inhibitors – enabling greater inhibition of important cellular pathways where that level of inhibition has been unachievable due to off target toxicity; and (iii) differentiated efficacy with approved drugs – improving upon safety and efficacy with previously approved chemotherapeutic agents.

### 1.      Manufacturing of ACCURINS®

8.      BIND manufactures ACCURINS® using a highly specialized, self-assembly manufacturing process that is the backbone of its Medicinal Nanoengineering® platform.   BIND has more than five issued U.S. patents relating to the Accurin manufacturing processes.

9.      BIND has a pilot manufacturing facility at its Cambridge, Massachusetts location. It does not, however, currently own or operate GMP manufacturing facilities for the production of any of its drug candidates.   It relies on third-party contract manufacturers for all of its required raw materials, therapeutic payload, and finished product for its preclinical research and clinical trials.   BIND has invested in a dedicated compounding space at a contract manufacturer, where it expects to be able to manufacture at the double-digit kilogram scale.   BIND employs internal resources to manage its third-party contract manufacturers.

### 2.      Collaborations

10.      BIND has collaboration agreements with Pfizer Inc. and AstraZeneca AB.   In addition, BIND has research agreements with F. Hoffmann-La Roche Ltd., Merck & Co.,

Macrophage Therapeutics (a subsidiary of Navidea Biopharmaceuticals), Synergy Pharmaceuticals, and PeptiDream, Inc. to develop applications of BIND's Accurin technology.[4]

11.    BIND's collaboration agreements generally require the collaborator to pay all the development costs associated with the Accurin, including those incurred by BIND.  The upfront and potential milestone payments received under these agreements also provide BIND with additional capital resources to develop its own proprietary pipeline of ACCURINS®.

### 3.    Intellectual Property

#### a.    Medicinal Nanoengineering® Platform Patent Portfolio

12.    As of the Petition Date, BIND owns more than 20 issued U.S. patents and has filed more than 40 pending U.S. provisional and non-provisional patent applications relating to its Medicinal Nanoengineering® platform, as well as issued and pending foreign counterparts to many of these patents and patent applications.[5]

13.    As of the Petition Date, BIND has licenses to more than 10 U.S. patents and six pending patent applications, as well as several pending foreign counterparts to many of these patents and patent applications that also relate to its Medicinal Nanoengineering® platform. BIND licenses the majority of these licensed patents and patent applications on an exclusive basis.

#### b.    In-Licensed Intellectual Property

14.    In June 2007, BIND and Massachusetts Institute of Technology ("**MIT**") entered into a license agreement, which was amended in November 2008 and April 2013 (as amended,

---

[4]    BIND's collaboration with AstraZeneca has resulted in the Aurora B Kinase inhibitor Accurin AZD2811, which became the second Accurin candidate to enter clinical development.  BIND's collaboration with Pfizer has resulted in the selection of an Accurin candidate that is entering IND-enabling studies.

[5]    As of the Petition Date, of the owned Medicinal Nanoengineering® platform patents and patent applications, more than 10 issued U.S. patents, more than 10 pending U.S. provisional and various non-provisional patent applications and pending foreign counterparts relate to BIND's BIND-014 ACCURIN®.

LA\4448508.7

the "**MIT Agreement**").   Pursuant to the MIT Agreement, MIT granted BIND a worldwide license under certain periods and patent applications generally relating to targeted nanoparticles and methods of making targeted nanoparticles to develop and commercialize licensed products and processes for all therapeutic and diagnostic uses and as research reagents, subject to certain exceptions.

15.     In February 2009, BIND and The Johns Hopkins University ("**JHU**") entered into a license agreement, which was amended in January 2013, pursuant to which JHU granted BIND an exclusive, worldwide license under some of its intellectual property rights relating to nanoparticles targeting prostate-specific membrane antigen in all fields of use.

16.     In January 2013, BIND entered into a license agreement with Yale University ("**Yale**"), pursuant to which Yale granted BIND an exclusive, worldwide license under specified intellectual property rights relating to targeted and high density drugloaded polymeric materials to develop and commercialize licensed products and to practice licensed methods for the treatment of cancer.

4.     **Headquarters and Employees**

17.     BIND's headquarters are located in Cambridge, Massachusetts, where BIND occupies approximately 51,000 square feet of office and laboratory space.[6]  As of the Petition Date, BIND had 65 full-time employees, approximately 50 of whom were primarily engaged in research and development activities.   None of BIND's employees are represented by a labor union.

---

[6]     BIND also leases office and laboratory space in Moscow, Russia.

6

B.    **Corporate Structure**

18.    BIND was incorporated under the laws of the state of Delaware on May 19, 2006 under the name BIND Biosciences, Inc.  In April 2013, BIND Biosciences, Inc. changed its name to BIND Therapeutics, Inc.  On September 25, 2013, BIND completed an initial public offering of its common stock and was listed on The NASDAQ Stock Market under the symbol "BIND".  As of April 27, 2016, BIND had 20,886,802 common shares outstanding, of which approximately 2,800,000 were held by insiders.  As of December 31, 2015, BIND also has approximately 3,245,780 and 2,399,117 in stock options and warrants outstanding, respectively.

19.    BIND Security, which was founded in December 2007, buys and sells securities on its own behalf and not as a broker.  As a result of certain restrictions in the Prepetition Credit Agreement (as defined below),[7] BIND has not made any investments into BIND Security since February 11, 2015.  BIND Security currently has no employees.

20.    As shown on the corporate organizational chart attached hereto as **Exhibit A**, BIND is the direct parent of BIND Security and BIND Russia.

C.    **Summary of Prepetition Debt**

21.    BIND is party to that certain Amended and Restated Loan and Security Agreement, dated as of June 12, 2013 (as the same has been and may be amended, restated, supplemented or otherwise modified from time to time, the "**Prepetition Credit Agreement**", together with all other loan documents, security instruments and other documents related to, referenced in or executed in connection with the Prepetition Credit Agreement prior to the Petition Date, the "**Prepetition Documents**"), with  Hercules  Technology  III,  L.P.

---

[7]    Under the Prepetition Credit Agreement, Bind is permitted to make investments in BIND Security as long as it maintains liquidity of at least $25 million minus any payments of principal made on the term loan.

(the "**Prepetition Lender**"), pursuant to which the Prepetition Lender provided loans to BIND (the "**Prepetition Facility**").

22.     As of the Petition Date, the principal amount outstanding under the Prepetition Documents was not less than $13.2 million (together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Prepetition Documents, including, without limitation, accrued and unpaid interest (including at applicable default rates), any fees, expenses and disbursements (including, without limitation, reasonable attorneys' and other professionals' fees, related expenses and disbursements), reimbursement obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of BIND's obligations pursuant to the Prepetition Documents relating solely to the loans provided thereunder, the "**Prepetition Obligations**").

23.     To secure the Prepetition Obligations, and pursuant to the Prepetition Documents, BIND granted to the Prepetition Lender security interests in and liens on certain assets of BIND as described in the Prepetition Documents (the "**Prepetition Liens**") including, without limitation, (a) Receivables[8]; (b) Equipment; (c) Fixtures; (d) General Intangibles; (e) Inventory; (f) Investment Property; (g) Deposit Accounts; (h) Cash; (i) Goods; and (j) other tangible and intangible personal property of BIND owned, leased, consigned by or to, or acquired by BIND wherever located; and, to the extent not otherwise included, all Proceeds of each of the forgoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing (collectively, subject to certain exclusions set forth in the Prepetition Documents, the "**Prepetition Collateral**").

---

[8]     Capitalized terms used but not defined in this Paragraph shall have the definition ascribed to such terms in the Prepetition Documents.

24.     The Debtors believe that the Prepetition Lender is over-secured by approximately $10.9 million.

## II.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

25.     There are many risks and uncertainties associated with pharmaceutical development.  Identifying potential drug candidates and conducting preclinical testing and clinical trials is a time-consuming, expensive, and uncertain process that can take years to complete.

26.     To become and remain profitable, companies in this industry must develop and eventually commercialize products that generate significant revenue.  This requires that a company succeed at a number of challenging activities, including completing preclinical testing and clinical trials of its drug candidates, discovering additional drug candidates, obtaining regulatory approval for its drug candidates, and manufacturing, marketing, and selling any products for which it may obtain regulatory approval, and establishing and managing its collaborations at various stages of each candidate's development.

27.     BIND's first drug candidate to enter clinical development was BIND-014.  In 2013, BIND initiated two Phase 2 clinical trials to evaluate the level of clinical activity of BIND-014.  In November 2014, BIND announced positive topline data for BIND-014 in the non-small cell lung cancer ("**NSCLC**") patient population.  Based on these results, BIND initiated the two-stage phase 2 iNSITE 1 trial to evaluate BIND-014 for the treatment of NSCLC patients with Kirsten Rat Sarcoma Viral Oncogene Homolog ("**KRAS**") mutations or squamous histology.  In December 2015, BIND announced that the squamous histology NSCLC cohort of the iNSITE 1 trial would advance to the second stage and complete enrollment to 40 patients.  BIND also announced that the KRAS mutant NSCLC arm would not advance to the second stage.  The

LA\4448508.7

rationale for these decisions was based on safety and efficacy data as well as updated overall survival data.

28.    In January 2015, BIND also announced positive topline data from the ongoing Phase 2 trial in metastatic castrate resistant prostate cancer ("**mCRPC**"); however, given the rapidly emerging treatment landscape in mCRPC, BIND decided not to move forward with the development of BIND-014 in mCRPC and focus its resources elsewhere.  BIND also initiated a clinical trial with BIND-014 in advanced cervical, bladder, head and neck and cholangio cancers in 2015.  In January 2016, BIND discontinued the bladder and cholangio cohorts of this trial due to slower than anticipated enrollment.

29.    In April 2016, BIND reported clinical data for BIND-014 in the following indications: (i) NSCLC with squamous histology; (ii) advanced cervical cancer; and (iii) head and neck cancer.

30.    This proceeding was commenced, in large part, because, on April 26, 2016, the Prepetition Lender sent a Notice of Default to the Debtors notifying them of certain purported Events of Default under the Prepetition Credit Agreement and demanding immediate payment in full of all amounts due under the Prepetition Facility in the amount of $14,523,318.24.  This action forced the rapid filing of these Chapter 11 Cases, which the Debtors' boards of directors concluded was in the best interest of the Debtors, their creditors, and other parties in interest.

## **PART II**

31.    In furtherance of the objective of a value-maximizing reorganization of the Debtors, the Debtors have sought approval of the First Day Pleadings and related orders (the "**Proposed Orders**"), and respectfully request that the Court consider entering the Proposed Orders granting such First Day Pleadings.  For the avoidance of doubt, the Debtors seek

LA\4448508.7

authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in any of the First Day Pleadings.

32.    I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimum interruptions and disruptions to their businesses or loss of productivity or value and (b) constitutes a critical element in the Debtors' being able to successfully maximize value for the benefit of their estates.

## I.    ADMINISTRATIVE AND PROCEDURAL PLEADINGS

### A.    Motion of Debtors for Order Under Fed. R. Bankr. P. 1015 and Del. Bankr. L.R. 1015-1 Authorizing Joint Administration of Chapter 11 Cases

33.    The Debtors seek the joint administration of their two Chapter 11 Cases for procedural purposes only.  The Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings, and orders in the Chapter 11 Cases will affect both of the Debtors. The failure to jointly administer these two cases would result in two individual case dockets and, I believe, inevitably lead to numerous duplicative filings for each issue, which would then be served upon separate service lists.  This duplication would be extremely wasteful and would unnecessarily overburden the Clerk of the Court and the Debtors.

LA\4448508.7

## II.    BUSINESS OPERATION MOTIONS

### A.    Motion of Debtors for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a), 345, 363, and 364, Fed. R. Bankr. P. 6003, and Del. Bankr. L.R. 2015-2 and 4001-3 (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, and (II) Authorizing Continuation of Existing Deposit Practices (the "**Cash Management Motion**")

34.    In the Cash Management Motion, the Debtors seek entry of interim and final orders, pursuant to Bankruptcy Code Sections 105(a), 345, 363, and 364, (i) authorizing, but not directing, the Debtors to continue to maintain and use their existing cash management system, including maintenance of existing bank and investment accounts, checks, and business forms; (ii) granting the Debtors a waiver of certain bank account and related requirements of the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") to the extent that such requirements are inconsistent with the Debtors' practices under their existing cash management system or other actions described in the Cash Management Motion; and (iii) authorizing, but not directing, the Debtors to continue to maintain and use their existing deposit practices notwithstanding the provisions of Bankruptcy Code Section 345(b).  The Debtors also request that the Court authorize and direct all banks with which the Debtors maintain accounts to continue to maintain, service, and administer such accounts and authorize third-party payroll and benefits administrators and providers to prepare and issue checks on behalf of the Debtors.

### 1.    The Debtors' Cash Management System and the Bank Accounts

35.    In the ordinary course of their businesses, the Debtors maintain a cash management system (the "**Cash Management System**") that is integral to the operation and administration of their businesses.  The Cash Management System allows the Debtors to (i) monitor and control all of the Debtors' cash receipts and disbursements, (ii) identify the cash requirements of the Debtors and their non-debtor affiliate, (iii) transfer cash as needed to respond

to the cash requirements of the Debtors and their non-debtor affiliate, and (iv) track all intercompany transfers.

36.    The Cash Management System is managed by the Debtors at their headquarters in Cambridge, Massachusetts, where they oversee the administration of the various bank and investment accounts to effect the collection, disbursement, and movement of cash.   Their oversight facilitates accurate cash forecasting and reporting and the monitoring of the collection and disbursement of funds to and from the Debtor Bank Accounts (as defined below).

37.    I believe that the Cash Management System is organized in a way that respects the separate cash funding and operating needs of the Debtors and their non-debtor affiliate.   A diagram depicting the Cash Management System is annexed as <u>Attachment 1</u> to the Cash Management Motion.   As of the Petition Date, the Debtors maintain five bank and investment accounts (the "**<u>Debtor Bank Accounts</u>**") in the United States, and their non-debtor affiliate, BIND Russia, maintains four bank accounts in Russia.   Specifically, the Debtor Bank Accounts consist of (a) three bank accounts held at Comerica Bank ("**<u>Comerica</u>**") in the United States, and (b) two investments accounts held at Capital Advisors Group (investment advisor) with State Street as custodian   in the United States, which include money market fund holdings and Treasuries.

38.    In addition, it is my understanding that BIND Russia maintains four bank accounts held at local banks in Russia (the "**<u>BIND Russia Accounts</u>**").   Funds in such accounts are held either in U.S. Dollars or Russian rubles.

LA\4448508.7

39.    A schedule of the Debtor Bank Accounts is annexed as <u>Attachment 2</u> to the Cash Management Motion.[9]  As reflected in <u>Attachment 2</u> to the Cash Management Motion, each of the Debtor Bank Accounts is held in the name of Debtor BIND or Debtor BIND Security.

40.    <u>Cash Collection and Distribution Process</u>.  As discussed above, BIND is developing targeted and programmable therapeutics with specified physical and chemical characteristics to target specific cells or tissues and concentrate a therapeutic payload at the site of disease to enhance efficacy while minimizing adverse effects on healthy tissues.  To diversify its pipeline and advance the knowledge and capabilities of its Accurin platform, BIND has formed and expects to continue to form collaborations with pharmaceutical companies seeking to develop potent pathway inhibitors that are limited due to toxicity at dosages needed to obtain a therapeutic effect.  BIND's collaboration with AstraZeneca AB has resulted in the initiation of a Phase 1 clinical trial with Accurin AZD2811, an Accurin that inhibits Aurora B kinase, a protein involved in the progression of cancer.  BIND also has a collaboration with Pfizer, Inc. to develop an Accurin containing a targeted kinase inhibitor for which preclinical research and CMC activities to support the initiation of clinical studies are underway.  These collaboration agreements generally require the collaborator to pay all of the development costs associated with the Accurin, including those incurred by BIND.  In addition, the upfront and potential milestone payments received under these agreements provide BIND with additional capital resources to develop its own proprietary pipeline of ACCURINS®.

41.    Funds received from such collaborations are wired to or deposited in BIND's operating account at Comerica (Account No. 4235)[10] (the "**Operating Account**").  Excess funds

---

[9]    The Debtors believe, and have undertaken reasonable efforts to ensure, that <u>Attachment 2</u> lists all of the bank and investment accounts that comprise the Debtors' Cash Management System.  In the event that any bank or investment account has been inadvertently omitted from <u>Attachment 2</u>, the Debtors request that the relief sought by the Cash Management Motion be deemed to apply to such account.

LA\4448508.7

in the Operating Account are transferred to an investment account held in the name of BIND at Capital Advisors Group (Account No. DE4120) (the "**Investment Account**").  The Investment Account includes money market holdings and Treasuries.  Funds are then moved back to the Operating Account from the Investment Account once or twice weekly on an as needed basis to pay for BIND's general operating expenses, including payments to BIND Russia for operating expenses on a cost plus reimbursement basis pursuant to a Service Agreement, effective as of January 1, 2015, by and between BIND and BIND Russia.  Funds from the Operating Account are distributed as necessary to pay all employees of the Debtors and to pay all operating costs of BIND, including all vendors, suppliers, lease parties, and professionals of BIND.

42.     BIND also maintains a money market account held at Comerica (Account No. 6013)  (the "**Money Market Account**") for use as a reserve in the event that funds are needed by BIND before it is able to transfer sufficient funds from the Capital Advisor Group Investment Account to the Comerica Operating Account to cover operating expenses.  However, the Money Market Account currently has no funds.  Finally, BIND maintains a restricted cash account at Comerica (Account No. 4896) that holds certain security deposits for the benefit of its landlord and Comerica with a balance of approximately $560,000.

43.     BIND Security also maintains an investment account at Capital Advisors Group to be used for investment purposes (Account No. DE4121) (the "**BIND Security Account**"). Investments in the BIND Security Account are limited by certain restrictions set forth in BIND's secured credit facility.  As a result, the balance of the BIND Security Account, as of the Petition Date, is approximately only $70.

---

[10]     For the sake of simplicity, this First Day Declaration uses only the last four digits of each account number to identify each account.

2.      **Continued Use of the Debtors' Cash Management System and the Debtor Bank Accounts**

44.      I believe that the Cash Management System is an ordinary course, customary and essential business practice, the continued use of which is essential to the Debtors' business operations during the Chapter 11 Cases and their goal of maximizing value for the benefit of all parties in interest.  To require the Debtors to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption.  Any disruption in the collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value.  Moreover, such a disruption would be wholly unnecessary because the Cash Management System provides a valuable and efficient means for the Debtors to address their cash management requirements and, to the best of the Debtors' knowledge, the majority of the Debtor Bank Accounts are held at financially stable institutions insured in the United States by the Federal Deposit Insurance Corporation ("**FDIC**").  In addition, the investment accounts have Capital Advisors Group as investment advisor and State Street Bank as custodian.  The investment accounts holdings include money market funds and Treasuries.  For the aforementioned reasons, maintaining the existing Cash Management System without disruption is in the best interests of the Debtors, their estates, and all interested parties.  Accordingly, the Debtors request that they be allowed to maintain and continue to use the Cash Management System, including maintenance of their existing Debtor Bank Accounts.

45.      As part of the relief requested in the Cash Management Motion, and to ensure that their transition into chapter 11 is as smooth as possible, the Debtors seek an order authorizing the Debtors to (i) maintain and continue to use the Debtor Bank Accounts, including but not limited to those accounts listed on <u>Attachment 2</u> to the Cash Management Motion, in the same manner

16

and with the same account numbers, styles, and document forms as are currently employed; (ii) deposit funds in and withdraw funds from the Debtor Bank Accounts in the ordinary course by all usual means, including checks, wire transfers, drafts, and electronic fund transfers or other items presented, issued, or drawn on the Debtor Bank Accounts; (iii) pay ordinary course bank and investment advisor fees in connection with the Debtor Bank Accounts, including prepetition fees; (iv) perform their obligations under the documents and agreements governing the Debtor Bank Accounts; and (v) for all purposes, treat the Debtor Bank Accounts as accounts of the Debtors in their capacities as debtors in possession.

46.     If the relief requested in the Cash Management Motion is granted, I have been informed that the Debtors will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by the Debtors prior to the Petition Date, other than those authorized by this Court.  To prevent the possible inadvertent payment of prepetition claims against the Debtors, except those otherwise authorized by the Court, the Debtors will work closely with the banks at which the Debtor Bank Accounts are maintained (each a "**Bank**" and, collectively, the "**Banks**") to ensure appropriate procedures are in place to prevent checks issued by the Debtors prepetition from being honored absent this Court's approval and to ensure that no third-party with automatic debit capabilities is able to debit amounts attributable to the Debtors' prepetition obligations.

47.     The Debtors request that no Bank that implements such handling procedures and then honors a prepetition check or other item drawn on any account that is the subject of the Cash Management Motion (a) at the direction of the Debtors to honor such prepetition check or item, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of a good faith error made despite implementation of reasonable item

LA\4448508.7

handling procedures, be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item being honored postpetition.  I believe that such flexibility accorded the Banks is necessary to induce the Banks to continue providing cash management services to the Debtors.

48.      In the Cash Management Motion, the Debtors further request that the Banks and Capital Advisors Group (the "**Investment Advisor**") be authorized to deduct from the appropriate Debtor Bank Accounts the Banks' fees and expenses and the Investment Advisor's fees and expenses (the "**Bank and Investment Advisor Fees and Expenses**"), and that no liens on any Debtor Bank Accounts take priority over the Bank and Investment Advisor Fees and Expenses except as set forth in any deposit agreements between the Debtors and the Banks and/or the Investment Advisor.

49.      Additionally, in each instance in which the Debtors hold one or more accounts at a bank that is a party to a Uniform Depository Agreement with the U.S. Trustee, within fifteen (15) days of the date of entry of an interim or final order granting the Cash Management Motion, the Debtors will (i) contact such bank, (ii) provide such bank with the Debtors' employer identification numbers, and (iii) identify each of their accounts held at such bank as held by a debtor-in-possession in a bankruptcy case.  Where the Debtors hold one or more accounts at a bank that is not a party to a Uniform Depository Agreement with the U.S. Trustee, the Debtors will use their good faith efforts to cause such bank to execute a Uniform Depository Agreement in a form prescribed by the Office of the U.S. Trustee within forty-five (45) days of the date of entry of an interim or final order granting the Cash Management Motion.

50.      In the interest of maintaining the continued and efficient operation of the Cash Management System during the pendency of the Chapter 11 Cases, the Debtors request that all

Banks be authorized and directed to continue to administer, service, and maintain the Debtor

Bank Accounts as such accounts were administered, serviced, and maintained prepetition,

without interruption and in the ordinary course (including making deductions for Bank and

Investment Advisor Fees and Expenses), and, when requested by the Debtors in their sole

discretion, to honor any and all checks, drafts, wires, electronic fund transfers, or other items

presented, issued, or drawn on the Debtor Bank Accounts on account of a claim against the

Debtors arising on or after the Petition Date.

51.     The Debtors further request that they be authorized to implement such reasonable

changes to the Cash Management System as the Debtors may deem necessary or appropriate,

including, without limitation, closing any of the Debtor Bank Accounts and opening any

additional bank accounts following the Petition Date (the "**New Accounts**") wherever the

Debtors deem that such accounts are needed or appropriate and whether or not the banks in

which the accounts are opened are designated approved depositories in the District of Delaware.

I understand that, notwithstanding the foregoing, any New Accounts that the Debtors open will

be at banks that have executed a Uniform Depository Agreement with the U.S. Trustee, or at

such banks that are willing to immediately execute such an agreement, and any New Account

that the Debtors open in the United States will be (x) at one of the existing Banks or with a bank

that is organized under the laws of the United States of America or any state therein and that is

insured by the FDIC or the Federal Savings and Loan Insurance Corporation and (y) designated a

"Debtor in Possession" account by the relevant bank.  The Debtors request that the relief sought

by the Cash Management Motion extend to any New Accounts and that any order approving the

Cash Management Motion provide that the New Accounts are deemed to be Debtor Bank

Accounts that are similarly subject to the rights, obligations, and relief granted in such order.  I

understand that the Debtors will provide the U.S. Trustee with prompt notice of any Debtor Bank Accounts that they close or New Accounts that they open.  In furtherance of the foregoing, the Debtors also request that the relevant banks be authorized to honor the Debtors' requests to open or close (as the case may be) such Debtor Bank Account(s) or New Account(s).

### 3.  Continued Use of the Debtors' Existing Checks and Business Forms

52.     To minimize expenses to their estates, the Debtors seek authorization to continue using all checks substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors in possession; *provided*, *however*, that in the event the Debtors generate new checks during the pendency of the Chapter 11 Cases other than from their existing stock of checks, such checks will include a legend referring to the Debtors as "Debtor in Possession."  The Debtors also seek authority to use all correspondence and other business forms (including, without limitation, letterhead, purchase orders, and invoices) without reference to the Debtors' status as debtors in possession.[11]

53.     I believe that changing the Debtors' existing checks, correspondence, and other business forms would be expensive, unnecessary, and burdensome to the Debtors' estates. Further, such changes would disrupt the Debtors' business operations and would not confer any benefit upon parties that deal with the Debtors.  For these reasons, the Debtors request that they be authorized to use their existing check stock, correspondence, and other business forms without being required to place the label "Debtor in Possession" on any of the foregoing.

---

[11]     Although the operating guidelines established for debtors in possession by the U.S. Trustee would require the Debtors to obtain and use new checks bearing the "Debtor in Possession" designation, the Debtors do not believe that such guidelines impose any limitation on the Debtors' other correspondence and business forms.  Nevertheless, out of an abundance of caution, the Debtors seek explicit authority to continue using their existing correspondence and business forms without reference to the Debtors' status as debtors in possession.

4.      **Waiver of Certain Requirements of the U.S. Trustee**

54.      The Debtors further request, pursuant to Bankruptcy Code Sections 105(a) and 363, that this Court grant a waiver of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with (i) the Debtors' existing practices under the Cash Management System or (ii) any action taken by the Debtors in accordance with any order granting the Cash Management Motion or any other order entered in the Chapter 11 Cases.  I understand that in order to supervise the administration of chapter 11 cases, the U.S. Trustee has established certain operating guidelines for debtors in possession.  I have been informed that these requirements (the "**UST Requirements**") require chapter 11 debtors to, among other things: (i) close all existing bank accounts and open new debtor in possession bank accounts; (ii) establish one debtor in possession account for all estate monies required for the payment of taxes, including payroll taxes; (iii) maintain a separate debtor in possession account for cash collateral; and (iv) obtain checks for all debtor in possession accounts that bear (a) the designation "Debtor In Possession," (b) the bankruptcy case number, and (c) the type of account.  It is my understanding that the UST Requirements are designed to demarcate clearly prepetition transactions and operations from postpetition transactions and operations, and to prevent the inadvertent postpetition payment of prepetition claims.  As noted previously, I believe that (i) the Debtors will be able to work with the Banks and the Investment Advisor to ensure that this goal of separation between the prepetition and postpetition periods is observed and (ii) enforcement of certain of these UST Requirements would disrupt the Debtors' operations and impose a financial burden on the Debtors' estates.

55.      I believe it would be onerous for the Debtors to meet the UST Requirement to close all existing bank and investment accounts and open new debtor in possession accounts. Indeed, I believe that this requirement would unnecessarily inconvenience the Debtors.

LA\4448508.7

56.     Further, it would be unnecessary and inefficient to require the Debtors to abide by the UST Requirement to establish specific debtor in possession accounts for tax payments (including payroll taxes) and to deposit to such accounts sufficient funds to pay any tax liability (when incurred) associated with the Debtors' payroll and other tax obligations.  I believe that the Debtors can pay their tax obligations most efficiently from their existing disbursement accounts at Comerica in accordance with their existing practices, and the U.S. Trustee will have wide latitude to monitor the flow of funds into and out of such accounts.  The creation of new debtor in possession accounts designated solely for tax obligations would be unnecessarily burdensome.

57.     In addition, I believe that it is unnecessary to require the Debtors to abide by the UST Requirement to establish specific debtor in possession accounts for cash collateral.  It is my understanding that, as set forth in the Debtors' motion for authority to use cash collateral, the Debtors have provided significant safeguards to ensure that parties with security interests in the Debtors' cash collateral are adequately protected and that such parties have been provided with notice of the proposed use of such cash collateral.

5.     **Continued Deposit Practices**

58.     As part of the Cash Management System, the Debtors routinely deposit funds into the Debtor Bank Accounts (the "**Deposit Practices**").  In the Cash Management Motion, the Debtors request (i) authorization to continue to deposit funds in accordance with existing practices under the Cash Management System, subject to any reasonable changes the Debtors may implement to the Cash Management System, and (ii) a waiver of the deposit requirements of Bankruptcy Code Section 345(b), on an interim basis, to the extent that such requirements are inconsistent with the Deposit Practices.  For the avoidance of doubt, to the extent any of the Debtor Bank Accounts may be classified as investment accounts, or to the extent any of the Debtors' routine deposits into Debtor Bank Accounts may be regarded as investment activity, the

Debtors seek authorization to continue to deposit funds into such Debtor Bank Accounts in accordance with existing practices, notwithstanding the requirements of Bankruptcy Code Section 345(b).

      6.      **The Debtors Should Be Authorized to Allow Funds Paid to BIND Russia to Remain in Accounts in Russia**

59.     In the Cash Management Motion, the Debtors request authority to allow, at their discretion, all funds deposited in the BIND Russia Accounts prior to the Petition Date to remain in the BIND Russia Accounts for use by BIND Russia, rather than seeking the transfer of any such funds from the BIND Russia Accounts to one or more of the Debtor Bank Accounts.

**B.**     **Motion of Debtors for Order Under 11 U.S.C. §§ 105 and 363 (A) Authorizing Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with, Various Insurance Policies, and (B) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto (the "<u>Insurance Motion</u>")**

60.     In the Insurance Motion, the Debtors request entry of an order authorizing the Debtors to (a) continue and renew their Insurance Policies, or obtain new insurance policies, as needed in the ordinary course of business and (b) honor all of their prepetition and postpetition obligations, including payment of all outstanding prepetition Insurance Obligations, under and in connection with the Insurance Policies on an uninterrupted basis and in accordance with the same practices and procedures as were in effect before the Petition Date, including premiums arising under the Insurance Policies and the Broker Fees.

61.     The Debtors also seek entry of an order authorizing the Banks to receive, process, honor, and pay checks or electronic transfers used by the Debtors to pay the foregoing and to rely on the representations of such Debtors as to which checks are issued and authorized to be paid in accordance with the Insurance Motion.

LA\4448508.7

62.     As described in the Insurance Motion, in the ordinary course of their businesses, the Debtors maintain numerous insurance policies with various insurance providers (collectively, the "**Insurers**") that provide coverage for, among other things, products liability, general liability, property, business automobile, umbrella liability, excess liability, commercial crime, special crime, director and officer liability, fiduciary liability, foreign liability, worldwide transit liability, employment practices liability, and workers' compensation claims (the "**Insurance Policies**"), as summarized in Exhibit B to the Insurance Motion.  The Debtors will have incurred a total of approximately $856,938 in the aggregate in premiums under the terms of their existing Insurance Policies as well as other obligations, including the Broker Fees and other related fees and costs (collectively, the "**Insurance Obligations**").   In addition, the Debtors may make retroactive adjustments in the ordinary course of business with respect to one or more of the Insurance Policies, as applicable.

63.     As set forth in the Insurance Motion, the Debtors maintain third-party Insurance Policies through various insurance companies.   The Insurance Policies are essential to the ongoing operation of the Debtors' business.   In many cases, the coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business operations.

64.     Accordingly, for the reasons set forth herein and in the Insurance Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in compliance with contractual and regulatory requirements and to safeguard the value of their estates.

LA\4448508.7

**C.** **Motion of Debtors for Order Under 11 U.S.C. §§ 105(a), 363(b), 506(a), 507(a)(8), and 541 and Fed. R. Bankr. P. 6003 Authorizing Payment of Prepetition Taxes and Fees (the "Tax Motion")**

65.     In the Tax Motion, the Debtors seek entry of an order pursuant to Bankruptcy Code Sections 105(a), 363(b), 506(a), 507(a)(8), and 541 and Bankruptcy Rule 6003, authorizing them to pay, in their sole discretion, but subject to the terms and provisions of any cash collateral and/or postpetition financing agreement made by the Debtors or order entered by the Court, any prepetition tax and fee obligations including, without limitation, use taxes; franchise taxes; personal property taxes; any other types of taxes, fees, or similar charges; and any penalty, interest, or similar charges in respect of such taxes (collectively, the "**Taxes and Fees**") owing to certain federal, state, provincial, and local governmental entities in the United States, including as listed on Exhibit B to the Tax Motion (the "**Taxing Authorities**").  It is my understanding that the Debtors propose to limit the aggregate amount of payments to be made on account of prepetition Taxes and Fees under the Tax Motion to $200,000 unless further authorization is obtained from this Court.

66.     For the avoidance of doubt, it is my understanding that the requested authorization (i) would be discretionary, allowing the Debtors, among other things, to elect to pay Taxes and Fees as to which their officers and directors may have personal liability in the event of nonpayment by the Debtors, before other Taxes and Fees, (ii) would be without prejudice to the Debtors' rights to contest the amounts of any Taxes and Fees on any grounds they deem appropriate, and (iii) would extend to the payment of Taxes and Fees relating to tax audits that have been completed, are in progress, or arise from prepetition periods.

67.     In addition, the Debtors request in the Tax Motion that the Court authorize the Debtors' banks to receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Taxes and Fees that had not been honored and paid as of the

Petition Date, and authorize the Debtors' banks and financial institutions to rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid in respect of Taxes and Fees, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

68.     As set forth in the Tax Motion, it is my understanding that the Taxes and Fees at issue are appropriate for payment to the extent that they are priority or secured claims that are payable in full or, alternatively, under the personal liability theory or the doctrine of necessity.  I believe that by paying the Taxes and Fees in the ordinary course of business, as and when due, the Debtors will avoid unnecessary disputes with the Taxing Authorities—and expenditures of time and money resulting from such disputes—over myriad issues that are typically raised by such units as they attempt to enforce their rights to collect Taxes and Fees.

69.     Prior to the Petition Date, the Debtors incurred obligations to federal, state, provincial and local governments in the United States.  Although, as of the Petition Date, I believe the Debtors were substantially current in the payment of assessed and undisputed Taxes and Fees, certain Taxes and Fees attributable to the prepetition period may not yet have become due.  It is my understanding that certain prepetition Taxes and Fees may not be due until the applicable monthly, quarterly, or annual payment dates—in some cases immediately and in others not until next year.[12]  I have been informed that in 2015, the Debtors paid approximately $258,299.08 on account of Taxes and Fees.

70.     I believe that the continued payment of the Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects for a successful Chapter 11 process.  It is my understanding that, if such obligations are

---

[12]     The Delaware Franchise Tax requires an annual payment of $180,000.  Half of this payment is invoiced around September, with the remainder paid when the return is filed in February.

not timely paid, the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws, including whether (a) the obligations are priority, secured, or unsecured in nature, (b) the obligations are proratable or fully prepetition or postpetition, and (c) penalties, interest, attorneys' fees and costs can continue to accrue on a postpetition basis and, if so, whether such penalties, interest, attorneys' fees, and costs are priority, secured, or unsecured in nature.

71.    Moreover, I have been advised that certain of the Taxes and Fees may be considered to be obligations as to which the Debtors' officers and directors may be held directly or personally liable in the event of nonpayment.  In such events, I believe that collection efforts by the Taxing Authorities would provide obvious distractions to the Debtors and their officers and directors in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

72.    I have been informed that certain of the Taxing Authorities may not have been paid or may have been sent checks and/or fund transfers for Taxes and Fees that may or may not have been presented or cleared as of the Petition Date.  Similarly, in other cases, Taxes and Fees have accrued or are accruing, or are subject to audit or review, but have not yet become due and payable and, thus, any checks or fund transfers will be issued on a postpetition basis. Accordingly, the Debtors seek entry of an order authorizing and directing their banks and other financial institutions to receive, process, honor, and pay all prepetition and postpetition checks and fund transfers issued by the Debtors to the Taxing Authorities in payment of Taxes and Fees that had not been honored and paid as of the Petition Date, and authorizing the Debtors' banks and financial institutions to rely on the representations of the Debtors as to which checks and

27

fund transfers should be honored and paid in respect of Taxes and Fees, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

  **D.**  **Motion of Debtors for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief (the "Cash Collateral Motion")**

  73.  In the Cash Collateral Motion, the Debtors request (a) authorization to use Cash Collateral as provided therein; (b) authorization to provide adequate protection as specified therein in favor of the Prepetition Lender to secure the Prepetition Liens in connection with the Debtors' use of Cash Collateral in which the Prepetition Lender has an interest, and any diminution in value of the Prepetition Lender's interest in the Prepetition Collateral; (c) pursuant to Bankruptcy Rule 4001, the scheduling of an interim hearing on the Motion to consider entry of the Interim Order; and (d) the scheduling of the Final Hearing to be held within thirty (30) days of the Petition Date to consider entry of the Final Order.

  74.  If the Cash Collateral Motion is not approved and the Debtors do not obtain authorization to use the Cash Collateral, I believe that the Debtors will suffer immediate and irreparable harm. Without the use of the Cash Collateral, the Debtors will not have the liquidity to conduct their business as a going concern. The Debtors do not have and have not had access to their Cash Collateral since the commencement of the Chapter 11 Cases. The Debtors urgently need funds to make payroll, capital expenditures and other expenditures that are critical to their continued viability and ability to reorganize their capital structure.

  75.  As described above, it is vital to the success of the Debtors' reorganization efforts that they immediately obtain access to Cash Collateral. The preservation of the Debtors' business and the Debtors' ability to reorganize successfully depend heavily upon the expeditious approval of the use of Cash Collateral for general working capital purposes. Absent this Court's

approval of the interim relief sought in the Cash Collateral Motion, the Debtors face a substantial risk of severe disruption to their business operations and irreparable damage to their relationships with their vendors and customers.

76.     The Debtors' request for use of Cash Collateral is limited to budgeted expenses reasonably calculated to maximize the value of the Debtors' assets and the realization on the Prepetition Collateral.

77.     The Debtors have an urgent need for the immediate use of the Prepetition Collateral, including the Cash Collateral.  The Debtors need the Cash Collateral to pay operating expenses all in accordance with the Budget (as defined below).  Indeed, absent such relief, the Debtors' businesses will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors.

78.     The Debtors, with the assistance of their financial advisors, have prepared a budget, a copy of which is attached to the Cash Collateral Motion as Exhibit A (the "**Budget**"), which shows, *inter alia*, the Debtors' forecasted receipts and disbursements from the Petition Date through July 29, 2016.   Under the Budget, the Debtors intend to use Cash Collateral, among other things, (i) to pay (a) payroll expenses, (b) postpetition trade amounts and (c) various prepetition claims paid in the ordinary course that are the subject of other motions filed concurrently herewith, as authorized by the Court; (ii) as working capital; (iii) to fund critical business operations conducted by the Debtors; and (iv) for other general corporate purposes.

79.     Absent the entry of an Order permitting the Debtors to use Cash Collateral to pay disbursements under the Budget, the Debtors will have insufficient funds available to operate their businesses, administer these Chapter 11 Cases and sell their assets as a going concern.

80.     The Debtors believe that the terms and conditions of their use of the Cash Collateral (including the provision of adequate protection described in the Cash Collateral Motion) are appropriate and reasonable and that such adequate protection is sufficient to secure any adequate protection obligations under the circumstances. Therefore, the Debtors submit that they should be authorized to use the Cash Collateral on the terms set forth in the Budget.

81.     Based on the Budget, as of the Petition Date, cash on hand and short term securities in the U.S. will total approximately $15.9 million. In addition, the Adequate Protection Liens cover both the Prepetition Collateral and, to the extent permissible under existing contracts, the Debtors' intellectual property rights, which were not part of the Prepetition Collateral. I have been informed that the Debtors' intellectual property rights have a value on their own that exceeds the Prepetition Obligations.

82.     A substantial amount of the Debtors' assets purportedly are encumbered under the Prepetition Facility. Therefore, it would be impossible to operate the Debtors' businesses and conduct the Chapter 11 Cases absent authorization to use the Cash Collateral. Unless this Court authorizes the use of the Cash Collateral, the Debtors' operations would likely cease, resulting in adverse effects on the value of the Debtors' estates to the severe detriment to all stakeholders. Particularly harmed would be the employees of the Debtors, whose employment would be terminated in the event the Debtors are unable to use the Cash Collateral.

83.     As described above, the Debtors have an urgent and immediate need for cash in order to maintain business relationships, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs and otherwise finance their operations.

84.     For the foregoing reasons, I believe that authorization to use Cash Collateral is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

LA\4448508.7

E.   **Motion of Debtors for Interim and Final Orders (A) Prohibiting Providers from Altering, Refusing or Discontinuing Service; (B) Approving the Debtors' Proposed Adequate Assurance of Payment for Postpetition Services; and (C) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment (the "Utilities Motion")**

85.   In the Utilities Motion, the Debtors request entry of interim and final orders (a) prohibiting the Utility Providers (as defined below) from (i) altering, refusing, or discontinuing utility services to, or discriminating against, the Debtors on account of any outstanding amounts for services rendered prepetition or (ii) drawing upon any existing security deposit, surety bond, or other form of security to secure future payment for utility services; (b) determining that adequate assurance of payment for postpetition utility services has been furnished to the Utility Providers providing services to the Debtors; and (c) establishing procedures for resolving future requests by any Utility Provider for additional adequate assurance of payment.

86.   In conjunction with their day-to-day operations, the Debtors receive traditional utility services from various utility providers (each, a "**Utility Provider**" and collectively, the "**Utility Providers**"), for, among other things, electricity, water, gas,[13] local and long-distance telecommunication services, data service, network services, waste disposal and removal (including hazardous waste), sewer service and other similar services (collectively, the "**Utility Services**").  The Utility Providers include, without limitation, the entities set forth on the list annexed to the Utilities Motion as Exhibit C (the "**Utility Providers List**").

---

[13]   Pursuant to that certain Lease, dated July 20, 2011, by and between BMR-325 Vassar Street LLC ("**Landlord**") and BIND Biosciences, Inc. (the "**Lease**"), payments due on account of electricity, water/sewer and gas services are paid by the Debtors to Landlord for distribution to the appropriate Utility Provider.  The Debtors receive invoices from Landlord for such services and have not yet received invoices for January through March 2016 for water/sewer charges or invoices for March electric and gas charges. As a result, the Debtors are unable to ascertain the amount due and owing to these Utility Providers as of the Petition Date.  In addition, a "Security Deposit," as defined in Section 11.1 of the Lease, shall be "held by Landlord as security for the faithful performance by Tenant of all of the terms, covenants and conditions of this Lease to be kept and performed by Tenant."  As a result, the Security Deposit, in the amount of approximately $560,000, covers all amounts due by the Debtors under the Lease.  The Debtors have not paid cash deposits and/or issued surety bonds or letters of credit to any Utility Providers directly.

87.     I have been informed that the Debtors paid an average of approximately $72,000 per month on account of all Utility Services during 2015.

88.     I believe that the Debtors' receipt of uninterrupted Utility Services is vital to the Debtors' continued business operations and, consequently, to the success of these Chapter 11 Cases.   Therefore, I believe that the relief requested in the Utilities Motion is necessary and in the best interests of the Debtors, their estates, and creditors.

**F.     Motion of Debtors for Order Establishing Notice and Hearing Procedures for Trading in Equity Securities of the Debtors (the "Equity Trading Motion")**

89.     The Debtors seek entry of an order (i) establishing notice and hearing procedures that must be satisfied before certain transfers of equity securities in BIND or of any beneficial interest therein are deemed effective and (ii) allowing for a hearing with respect to the prospective application of such procedures if any official committee of unsecured creditors appointed in these cases (the "**Creditors' Committee**") raises a timely objection.

90.     The Debtors have recently incurred, and are currently incurring, significant net operating losses ("**NOLs**") within the meaning of Section 172(c) of Title 26 of the United States Code, the Internal Revenue Code of 1986, as amended ("**IRC**").   Pursuant to the Equity Trading Motion, the Debtors seek authorization to protect and preserve their valuable tax attributes, including, without limitation, current year NOLs and available NOL carryforwards in excess of $119.4 million for U.S. federal income tax purposes (collectively, the "**Tax Attributes**").[14] These Tax Attributes could translate into potential future U.S. federal income tax savings for the Debtors of approximately $41.79 million, based on a U.S. federal income tax rate of 35%.

---

[14]     At December 31, 2015, the Debtors had federal, foreign, and state net operating loss carryforwards of approximately $119.4 million, $5.7 million, and $116.7 million, respectively, available to reduce future taxable income.  The federal net operating loss carryforwards expire beginning in 2027 and ending in 2035. The state net operating loss carryforwards began expiring in 2012 and may continue to expire through 2035.

LA\4448508.7

Moreover, the Tax Attributes are likely to be substantially higher when the Debtors emerge from chapter 11.

91.     The Tax Attributes are of significant value to the Debtors and their estates because the Debtors generally can carry forward their NOLs to offset their future taxable income for up to 20 taxable years, thereby potentially reducing their future aggregate tax obligations and freeing up funds to meet working capital requirements and service debt.  Such NOLs may also be available to the Debtors to offset taxable income generated by transactions completed during the Chapter 11 Cases.

92.     Specifically, unrestricted trading of BIND equity securities could adversely affect the Debtors' Tax Attributes if too many 5% or greater blocks of BIND equity securities are created or too many shares are added to or sold from such blocks, such that, together with previous trading by any person holding (or deemed to hold) 5% or more of the stock of BIND ("**5% Shareholders**") at any time during the preceding three-year or shorter period, as applicable (the "**Testing Period**"), an "ownership change" within the meaning of IRC Section 382 is triggered prior to consummation and outside of the terms of a confirmed Chapter 11 plan.

93.     The Debtors need the ability to monitor and object to changes in ownership of BIND's equity securities to preserve flexibility in crafting a plan of reorganization that qualifies for relief under one of the special bankruptcy provisions and, thus, maximize the Debtors' ability to reduce federal income taxes by offsetting their income earned after reorganization with Tax Attributes.

94.     Therefore, the Debtors seek to establish notice and hearing procedures regarding the trading of BIND Stock that must be complied with before such trades or transfers become effective.  If no trading restrictions regarding equity securities are imposed by this Court,

unrestricted trading or transfers of equity securities could severely limit or even eliminate the Debtors' ability to use their Tax Attributes, a valuable asset of the Debtors' estates, and could have significant negative consequences for the Debtors, their estates and the overall reorganization process.

95.     Absent granting the relief requested in the Equity Trading Motion, the Debtors could be irreparably harmed by the mere filing of the Equity Trading Motion.  If the Debtors filed the Equity Trading Motion in accordance with the usual notice procedures set forth in the Bankruptcy Rules, it is likely that a flurry of trading in stock of the Debtors could immediately follow.  Parties holding such stock might rush to transfer their stock before the restrictions on such trading are imposed by this Court.  Such trading would put the Tax Attributes in jeopardy and would therefore be counterproductive to the Debtors' objectives in seeking the relief sought in the Equity Trading Motion.  Accordingly, I believe that there is an immediate need to establish the notice and hearing provisions regarding trading in equity securities in the Debtors, as detailed in the Equity Trading Motion.

G.     **Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing Payment of Certain Prepetition Workforce Claims, Including Wages, Salaries, and Other Compensation, (B) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (C) Authorizing Payment of Reimbursement to Employees for Expenses Incurred Prepetition, (D) Authorizing Payment of Withholding and Payroll-Related Taxes, (E) Authorizing Payment of Workers' Compensation Obligations, and (F) Authorizing Payment of Prepetition Claims Owing to Administrators and Third-Party Providers (the "Employee Wage and Benefits Motion")**

96.     In the Employee Wage and Benefits Motion, the Debtors request entry of interim and final orders authorizing, but not directing, the Debtors to (a) pay prepetition claims and honor obligations incurred or related to the Compensation Obligations, the Withholding Obligations, the Incentive Programs, PTO and Vacation Time, the Reimbursable Expense

Obligations, the Employee Benefits Obligations, Workers' Compensation Claims, and all fees and costs incident to the foregoing, including amounts owed to third-party administrators (including the Administrative Fee Obligations) (collectively, the "**Employee Obligations**") and (b) maintain, continue, and honor, in the ordinary course of business, the Incentive Programs, PTO, Vacation Time, and holiday pay policies, postpetition Reimbursable Expense Obligations, the Employee Benefits Plans, and the Workers' Compensation Claims (collectively, the "**Employee Plans and Programs**").

97.     The Employees are the lifeblood of the Debtors' business, and their value cannot be overstated.  To a significant extent, the Debtors' success depends upon their ability to attract and retain qualified personnel.  The loss of certain Employees could impede the Debtors' research, development, and commercialization objectives and seriously harm their ability to successfully implement their business strategy.  Furthermore, replacing Employees can be difficult for the Debtors given the limited number of individuals in their industry with the breadth of skills and experience required to successfully develop, gain regulatory approval of, and commercialize products.

98.     If the Debtors cannot assure their Employees that they will promptly pay prepetition Employee Obligations to the extent allowed under the Bankruptcy Code, and continue to honor, as applicable, the Employee Benefits Obligations, certain Employees will likely seek employment elsewhere, potentially with the Debtors' competitors.  The loss of Employees at this critical juncture would have a material adverse impact on the Debtors' business and ability to maximize value through the prosecution of these Chapter 11 Cases.

99.     The Debtors also regularly utilize the services of Contract Workers to provide a variety of services.  The Contract Workers fill certain critical and immediate business needs of

the Debtors and allow the Debtors to have a flexible workforce to meet their operational needs in a cost-effective manner. In such capacity, the Contract Workers fill several types of roles for the Debtors, including providing temporary administrative, research, and facilities support services, as needed. The Contract Workers are a reliable and cost-efficient component of the Debtors' operations. Thus, as with the Debtors' regular Employees, if the Debtors fail to honor their prepetition compensation obligations to the Contract Workers, it is likely that the Debtors will lose such individuals' valuable services to the detriment of the Debtors' ongoing business operations.

100.    I believe that if the Debtors are unable to satisfy the Employee Obligations, Employee morale and loyalty will suffer at a time when Employee support is critical. Furthermore, in the absence of such payments, I believe that the Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors. Such a development would deplete the Workforce, hinder the Debtors' ability to service the needs of their customers, and likely diminish creditor and counterparty confidence in the Debtors. Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a substantial and costly distraction at a time when the Debtors must focus on sustaining their operations. Accordingly, I believe that the Debtors must be able to pursue all reasonable measures to retain the Employees by, among other things, continuing to honor wages, benefits, and related obligations, including those that accrued prior to the Petition Date, as set forth in the Employee Wage and Benefits Motion.

101.    Accordingly, for the reasons set forth herein and expanded on in the Employee Wage and Benefits Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Employee Wage and Benefits Motion is in the best interests of the Debtors'

estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in these Chapter 11 Cases with minimal disruption, thereby maximizing value for the estates.

**H.      Debtors' Application for Appointment of Prime Clerk LLC as Claims and Noticing Agent (the "156(c) Application")**

102.     In the 156(c) Application, the Debtors request entry of an order appointing Prime Clerk as the Claims and Noticing Agent for the Debtors and their Chapter 11 Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Chapter 11 Cases.   It is my understanding that the Debtors' selection of Prime Clerk to act as the Claims and Noticing Agent has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)*, in that the Debtors have obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process. Moreover, I submit that, based on all engagement proposals obtained and reviewed, that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.

103.     Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be in excess of 1,200 entities to be noticed.  In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent is required by Local Rule 2002-1(f) and is otherwise in the best interests of both the Debtors' estates and their creditors.

**II.      CONCLUSION**

104.     The Debtors' ultimate goal in these Chapter 11 Cases is the maximization of estate value through a plan process, but also a marketing process in the event that other value-

enhancing proposals can be obtained.  In the near term, however, to minimize any loss of value of their businesses during these Chapter 11 Cases, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the early stages of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and confirmation a chapter 11 plan will be substantially enhanced.

105.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Pleadings be granted, together with such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of May 2016.

BIND Therapeutics, Inc., et al.
Debtors and Debtors-in-Possession

Andrew Hirsch
President and Chief Executive Officer of
BIND Therapeutics, Inc.

**<u>Exhibit A</u>**

Organizational Chart

# Organizational Chart

