IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
In re:                                              :    Chapter 11
                                                    :
BIND THERAPEUTICS, INC., *et al.*[1]                :    Case No. 16-11084 BLS
                                                    :    (Joint Administration Requested)
           Debtors.                                 :
                                                    :    **Related Docket No. 9**
------------------------------------------------------------:
                                                    x    **Hearing date and time:**  May 3, 2016 at 2:00 p.m.

## PRELIMINARY OBJECTION OF HERCULES TECHNOLOGY III, L.P. TO MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. § § 105, 361, 362, 363 AND 364 (I) AUTHORIZING USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING AND (IV) GRANTING RELATED RELIEF

Hercules Technology III, L.P. ("**Hercules**"), by and through its counsel, Cole Schotz P.C., submits this Preliminary Objection to the Motion of Debtors for Interim and Final Orders Pursuant to 11 U.S.C. § § 105, 361, 362, 363 and 364 (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing and (IV) Granting Related Relief (the "**Motion**"), and respectfully states as follows:

### INTRODUCTION AND SUMMARY OF ARGUMENT

1.      Hercules is an affiliate of Hercules Capital, Inc., a public business development company specializing in providing secured debt and growth capital to companies in various stages of development. The parent company debtor, Bind Therapeutics, Inc. ("BIND" or "Debtor") is a very early stage and inherently speculative biotechnology company. As acknowledged in the First Day Declaration of Andrew Hirsch ("Hirsch Dec."), to become and remain profitable, companies such as BIND must "develop and **eventually** commercialize

---

[1] The Debtors, together with the last four digits of each Debtor's U.S. federal tax identification number are: BIND Therapeutics, Inc. (6148) and BIND Biosciences Securities Corporation (3208). The address for the Debtors is 325 Vassar Street, Cambridge, Massachusetts 02139.

49066/0027-13096575v2

products that generate significant revenue" and this requires success at "a number of challenging activities, including completing preclinical testing and clinical trials of its drug candidates, discovering additional drug candidates, obtaining regulatory approval for its drug candidates, and manufacturing, marketing and selling any products for which it **may** obtain regulatory approval…" (Hirsch Dec., ¶ 26, emphasis added).

2. Unfortunately, as is common in this extremely challenging industry, BIND has been entirely unsuccessful to date. While the Hirsch Dec. discloses that in April 2016, BIND reported clinical data in certain indications for its then only active drug candidate, BIND-014, it does not disclose that the data was unfavorable. Pursuant to a Form 8-K filed by BIND on April 6, 2016, immediately after this negative data was announced, BIND (i) undertook a reduction in force by terminating 38% of its employees, (ii) embarked on a process to review "financial and strategic alternatives," and (ii) recognized that "[T]here is no finite timetable for completion of the financial and strategic review process."

3. Since BIND's initial public offering in late September, 2013, its public market capitalization has dropped from approximately $250 million to $7.9 million as of the close of trading on this date. It has discontinued its clinical efforts with BIND-014 and remains a pre-revenue company drastically pivoting back to being a preclinical, pre-Phase I enterprise. Indeed, BIND has just now gone back to the drawing board, needing to develop a new asset to entice new investors. However, possible investors and the industry have already absorbed multiple public reports of BIND's lack of success.

4. The budget annexed to the Motion ("Budget") illustrates the substantial "burn" of cash by BIND. In the 13 week period ending July 29, 2016, BIND's available cash will plummet by a total of over $11.7 million -- from $15,865,000 to $5,130,000. Hercules is owed

approximately $14.5 million today and has excess cash coverage above its outstanding debt of approximately $1.3 million,  However, in a mere 3 weeks, the Budget shows that $2.63 million of cash will evaporate, and Hercules will be undercollateralized relative to cash by approximately $1.3 million.  In 13 weeks, this cash "undercollateralization" will grow to a staggering $8,000,000, even after considering the de minimis adequate protection payments being offered by the Debtor.

5. In addition to the paltry payments, the Debtor's proposed adequate protection for this drastic erosion during the 13 week period, is (i) "replacement liens" on the Debtor's assets that were subject to Hercules' Prepetition liens, (ii) intellectual property "**to the extent permissible under existing contracts**", and (iii) a Section 507(b) superpriority claim.  (Motion, ¶ 11E and F, emphasis added). However, a replacement lien on the same collateral Hercules already possesses and a 507(b) claim are worthless from a company that does nothing but burn cash while creating no new replacement collateral.  As for intellectual property, Hercules will show that such IP is of little or no value based on BIND's historic and recurring clinical and pre-clinical failures, the correlation between value and the need to spend tens of millions of dollars before the prospect of value even becomes evident, a public history of negative data, and other factors.  Even if the IP had some value, the Motion lacks any discussion of whether it can even be assigned under BIND's agreements with third parties.

6. This case was filed with the intent to burn through Hercules' cash collateral, and leave it with dubious collateral that is difficult to evaluate.  The value of such collateral is dependent on the success of a troubled and highly speculative enterprise in an industry where drug development failures exponentially outnumber successes.  It would be beyond inequitable if BIND turns out to be unsuccessful in its strategic efforts, its chapter 11 fails, it depletes millions

3

of dollars in cash collateral along the way, the protection being offered proves to be inadequate and existing investors swoop in to scoop up the cashless carcass on the cheap.  Should that occur, there would be little or no value for Hercules nor for any other creditors, all of whom could be paid **in full** with the cash on hand today.  It speaks volumes about the value of the speculative collateral that not a single existing investor, with whom active negotiations occurred through the eve of the filing, has stepped up to contribute a penny of capital. Instead they seek with impunity to throw up the proverbial "Hail Mary" from far behind half-court at the sole expense of creditors.

7. In light of this, Hercules requests that court scrutinize the Budget to approve use of the bare minimum amount of cash pending the final hearing solely to prevent immediate and irreparable harm to BIND.  The Budget is unclear on most of the categories of expenses and Hercules is awaiting certain information from BIND's counsel.  Additionally, Hercules urges that a final hearing be set as soon as the Court's calendar permits on our after May 16, 2106 and after the United States Trustee has had an opportunity to address possible Committee formation (despite this case having the makings of a classic two-party dispute with a relatively small amount of unsecured debt).

**THE DEBTORS' PRE-PETITION SECURED DEBT WITH HERCULES**

8. BIND and Hercules are parties that certain Amended and Restated Loan and Security Agreement dated as of June 12, 2013 (as the same was been and may be amended, restated, supplemented or otherwise modified from time to time, the "LSA").  Pursuant to the LSA, Hercules agreed to make a term loan in which $5 million was funded.  In the ensuing years, BIND issued numerous negative press releases and public filings to the industry and investment community, including (i) with respect to BIND-014, Phase 11a and INSIGHT1 trials

4

showing limited or insufficient efficacy and INSIGHT2 data which did not reach the primary endpoint resulting in termination of the clinical study; (ii) with respect to BIND-510 neuropathy side effects resulting in a decision not to move forward; (iii) termination of a partnership with Abbott Laboratories; and (iv) termination of a partnership with Amgen.

9. After the initial LSA, Hercules provided additional financing consisting of (i) an Amended and Restated Loan and Security Agreement in June, 2013 where an additional $4.5 million was funded and (ii) a First Amendment to Amended and Restated Loan Agreement in January 2015 when the Loan amount was upsized to $15 million.

10. To secure its obligations under the LSA, BIND granted Hercules security interests in substantially all of its assets including, without limitation, (a) Receivables;[2] (b) Equipment; (c) Fixtures; (d) General Intangibles; (e) Inventory; (f) Investment Property; (g) Deposit Accounts; (h) Cash; (i) Goods; and (j) other tangible and intangible personal property of BIND owned, leased, consigned by or to, or acquired by BIND wherever located; and, to the extent not otherwise included, all Proceeds of each of the forgoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing (collectively, subject to certain exclusions set forth in the LSA, the "**Collateral**").

11. To perfect its security interests in the Collateral, Hercules filed UCC-1 financing statements with the Delaware Secretary of State on January 13, 2011, April 2, 2013, May 16, 2013, June 13, 2013 and January 12, 2016.  Additionally, Hercules and BIND entered into control agreements relative to deposit and securities accounts.

12. As of the Petition Date, the Debtors owed Hercules approximately $14,500,000 inclusive of fees and charges under the LSA.

---

[2] Capitalized terms used in this paragraph shall have the meanings ascribed to them in the LSA.

**LEGAL ARGUMENT**

13. Section 363(c)(2) of the Bankruptcy Code provides that:

> (c)(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless –
>
> > (A) each entity that has an interest in such cash collateral consents; or
> >
> > (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

14. Before a bankruptcy court may approve a debtor's request to use cash collateral in accordance with this section of the Bankruptcy Code, the court must conclude that the creditor with an interest in the cash collateral is being adequately protected by the debtor. Section 363(e) provides that "[n]otwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

15. "Adequate protection" is defined in Section 361 of the Bankruptcy Code. Section 361 specifies three means of providing adequate protection: (1) periodic cash payments; (2) providing additional or replacement liens; or (3) other relief that will result in the "indubitable equivalent" of the secured creditor's interest. 11 U.S.C. § 361. The Debtors have the burden of affirmatively proving that the creditor is adequately protected and the creditor must establish the validity of its interest. 11 U.S.C. § 363(p)(1) and (2); see also Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 564 (3d Cir. 1994).

6

16. Here, the Debtors concede that Hercules has a valid and perfected first security interest in the Collateral to secure a claim of no less than $13.2 million (Hirsch Dec., ¶¶ 22-23)., Hercules has therefore preliminary satisfied its burden under Code Section 363(p)(2). The Debtor, however, has not and cannot satisfy its burden under Section 363(p)(1) to show that Hercules is adequately protected.

17. Pursuant to Bankruptcy Code Section 363(e), the providing of adequate protection of an interest in property is mandatory. See In re Metromedia Fiber Network, Inc., 290 B.R. 487, 491 (Bankr. S.D.N.Y. 2003) ("Section 363(e) is not permissive or discretionary - it states that the court 'shall' grant the relief specified, at any time, on request of the secured entity"); see also In re Heatron, Inc., 6 B.R. 493, 494 (Bankr. W.D. Mo. 1980). If adequate protection cannot be granted, the use, or proposed use, of collateral must be prohibited. See Metromedia, 290 B.R. at 491.

18. As stated in the legislative history, the purpose of 11 U.S.C. §361 "…is to insure that the secured creditor receives in value essentially what he bargained for." H.R. Rep. No 95-595, 95th Cong., 1st Sess.339, *reprinted* in 1978 U.S. Code Cong. & Admin. News 5787, 6295. In Provident Mutual Life Ins. Co. v. Winslow Center Associates (In re Winslow Center Associates), 32 B.R. 685, 688 (Bankr. M.D. Pa. 1983), the court construed the legislative history of Section 361 of the Bankruptcy Code to mean "that the creditor must receive the same measure of protection in bankruptcy that he would have had outside of bankruptcy although the type of protection may differ from the bargain initially struck between the parties." Id.

19. Even before examining the adequate protection offered to Hercules, this court should consider whether there is a reasonable chance of reorganization. Absent a reasonable chance for reorganization, "… there is no point in jeopardizing the creditor's cash collateral." In

7

re American Sweeteners, Inc., 2000 WL 1010582, *4 (Bankr. E.D. Pa. 2000).  Assuming the Debtors have a reasonable chance of reorganization, a determination of whether a lender received adequate protection requires an

> analysis of all of the relevant facts, with a particular focus upon the value of the collateral, the likelihood that it will depreciate or appreciate over time, the prospects for successful reorganization of the Debtor's affairs by means of the Plan, and the Debtor's performance in accordance with the Plan.

Id.

20.  Moreover, with respect to adequate protection, the "… focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." In re Becker Industries Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).  Accordingly, adequate protection must be based upon facts, not mere speculation. See In re Swedeland Dev. Group, 16 F.3d 552, 566 (3d Cir. 1994) ("We reject the notion that development property is increased in value simply because the debtor may continue with construction which might or might not prove to be profitable"); In re Timber Products, Inc., 125 B.R. 433, 440 (Bankr. W.D. Pa. 1990) ("Debtors ignore all potential negative contingencies and are overly optimistic regarding the basic expenses to be incurred"); In re Mosello, 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996) (stating, "[a] finding of adequate protection should be premised on facts, or on projections grounded on a firm evidentiary basis").  In fact, courts have routinely found that a debtor cannot establish adequate protection on the basis of an asset with mere speculative value.  See e.g., In re Phila. Consumer Discount Co., 37 B.R. 946, 952 (E.D. Pa. 1984) (denying use of cash collateral and granting stay relief where debtor's adequate protection plan was overly speculative in nature); In re Pacific Lifestyle Homes, Inc., 2009 WL 688908, at *11-12 (Bankr. W.D. Pa. Mar. 16, 2009) (debtor not entitled to use cash collateral where debtor's projections of profitability on real estate were speculative); In re DB Capital Holdings, LLC, 454 B.R. 804, 817-818 (Bankr. D.

Colo. 2011) (lifting automatic stay for lack of adequate protection where the possibility that debtors could complete a real estate development project, was speculative); Mosello, 195 B.R. at 292 (fining no adequate protection because the success of the debtor's business was subject to numerous risks, "any of which could cause the [business] to fail").

21.     Both the Motion and the Hirsch Dec. lack any proof to support the existence of an equity cushion other than as to BIND's cash.  In this case, there is no measure of adequate protection to Hercules that has been shown after the cash is depleted to less than Hercules' $14.5 million claim amount.  Contrary to the well settled caselaw above, a speculative hope of value accretion is not adequate protection.  Therefore, the Debtors' use of Cash Collateral must be limited to a maximum of no more than $1.3 million until there is a finding of value at the final hearing as to the speculative "non-cash" collateral.

22.     Additionally, until Hercules has an opportunity at the final hearing to present to the Court a clearer picture of the many substantial risks to BIND's prospects (which BIND has acknowledged repeatedly in its own public filings), the Motion must be denied to the extent that BIND intends to pay (i) rent which can be deferred under Section 365(d)(3) (ii) expenses for the BIND -014 clinical trial that concluded and was unsuccessful, (iii) manufacturing expenses for product development that are not necessary in the interim period, (iv) severance pay for terminated employees, (v) the "Other Operating Expenses" on the Budget for which no detail is given, and (vi) any other expenditure which, if not made, will not cause immediate and irreparable harm to BIND.  Based on the staggering rate of cash burn, the foregoing requests are reasonable in this very tenuous Chapter 11 proceeding.

## CONCLUSION

WHEREFORE, Hercules requests that the Court enter an order denying or limiting the relief requested in the Motion as set forth in more detail above and at the interim hearing.

Dated: Wilmington, Delaware
      May 2, 2016

**COLE SCHOTZ P.C.**

By: */s/ Marion M. Quirk*
    Marion M. Quirk (I.D. No. 4136)
    500 Delaware Avenue, Suite 1410
    Wilmington, DE 19801
    Telephone: (302) 652-3131
    Facsimile: (302) 652-3117

- and -

Stuart Komrower
Court Plaza North
25 Main Street
P. O. Box 800
Hackensack, NJ 07602-0800
Telephone: (201) 489-3000
Facsimile: (201) 489-1536

*Counsel for Hercules Technology III, L.P.*