1

2  UNITED STATES BANKRUPTCY COURT

3  DISTRICT OF DELAWARE

4  Case No. 16-11084(BLS)

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  DNIB UNWIND, INC. (F/K/A BIND

9  THERAPEUTICS, INC.), et al.,

10

11          Debtors.

12

13  - - - - - - - - - - - - - - - - - - - -x

14          United States Bankruptcy Court

15          824 North Market Street

16          Wilmington, Delaware

17

18          September 21, 2016

19          1:09 PM

20

21  B E F O R E:

22  HON. BRENDAN L. SHANNON

23  U.S. BANKRUPTCY JUDGE

24

25  ECR OPERATOR:  DANA MOORE

1

2    Debtors' Motion for Entry of an Order Approving Stipulation By

3    and Between DNIB Unwind, Inc. and Comerica Bank, a Texas

4    Banking Association [Docket No. 404 - filed September 12, 2016]

5

6    Debtors' Amended Combined Disclosure Statement and Chapter 11

7    Plan of Liquidation [Docket No. 415 - filed September 14, 2016]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Ellen S. Kolman

1

2  A P P E A R A N C E S :

3  LATHAM & WATKINS LLP

4        Attorneys for Debtors

5  BY:   PETER M. GILHULY, ESQ.

6        KIMBERLY A. POSIN, ESQ. (TELEPHONICALLY)

7

8

9  RICHARDS, LAYTON & FINGER, P.A.

10       Attorneys for Debtors

11  BY:   JOHN H. KNIGHT, ESQ.

12        AMANDA R. STEELE, ESQ.

13

14

15  UNITED STATES DEPARTMENT OF JUSTICE

16        Office of the United States Trustee

17  BY:   MARK KENNEY, ESQ.

18

19

20  LANDIS RATH & COBB LLP

21        Attorneys for John H. Coleman

22  BY:   MATTHEW B. MCGUIRE, ESQ.

23

24

25

1

2   SCHULTE ROTH & ZABEL LLP

3         Attorneys for John H. Coleman

4   BY:   DAVID J. KARP, ESQ.

5

6

7   ALSO APPEARING:

8         MOSHE SARFATY, PRO SE (TELEPHONICALLY)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE CLERK:  All rise.

3          THE COURT:  Please be seated.

4          Mr. Knight, good afternoon.

5          MR. KNIGHT:  Good afternoon, Your Honor.  John Knight

6   and Amanda Steele from Richards, Layton & Finger along with a

7   co-counsel Peter Gilhuly from Latham & Watkins --

8          THE COURT:  Welcome.

9          MR. KNIGHT:  -- for the debtors.

10          Your Honor, obviously, the main event today is our

11   combined disclosure statement and confirmation of our Chapter

12   11 plan --

13          THE COURT:  It is.

14          MR. KNIGHT:  -- which is item number 3 on the agenda.

15          Briefly, Your Honor, and I'll address the other items

16   on the agenda.

17          Quickly, number 1, Your Honor, which was our motion to

18   extend the exclusive periods, Your Honor had entered an order

19   on that and we thank you.

20          THE COURT:  Operator -- hang on -- operator, this is

21   Judge Shannon, are you on the line?  Operator, this is Judge

22   Shannon.

23          THE COURTCALL OPERATOR:  Thank you, Your Honor.  I did

24   make sure to mute that line.

25          THE COURT:  Thank you very much.  I appreciate it.

1          You may proceed, Mr. Knight.

2          MR. KNIGHT:  Thank you, Your Honor.

3          Flipping forward to item number 4, which was the first

4    and final fee application for IPmetrics, Your Honor has also

5    entered an order on that.

6          THE COURT:  I did.

7          MR. KNIGHT:  And we thank the Court for that.

8          That leaves the next item on the agenda, item number

9    2, which is the debtors' motion for an entry of an order

10   approving the stipulation between the debtor and Comerica Bank.

11         Briefly, Your Honor, as you may recall, the debtors'

12   lease was assigned to Pfizer, and along with that, there was a

13   letter of credit that supported the lease in the approximate

14   amount of 480,000 dollars held by Comerica Bank.  It's

15   collateralized by a money market account for a little more than

16   that:  about 559,000 dollars.

17         In connection with the transition of this debtor out

18   of being an operating entity, we've reached the stipulation

19   that was attached to the motion with Comerica.  And the basic

20   terms of that, Your Honor, are first, the automatic stay would

21   be modified to permit Comerica to apply funds from the money

22   market account to what we termed the credit card debt that's

23   about 16,000 dollars.

24         After that, to the extent the landlord draws down on

25   their letter of credit, Comerica shall have immediate relief

1  from stay to look to the funds to satisfy that.

2          THE COURT:  Right.

3          MR. KNIGHT:  And then, finally, upon the expiration of

4  the letter of credit, the funds will be returned to the

5  debtors.  This letter of credit expires, by its own terms, at

6  the end of October of this year, so we're not talking about a

7  long period of time.

8          THE COURT:  So we're just wrapping it up?

9          MR. KNIGHT:  Correct, Your Honor.

10          So we noticed this out, Your Honor, and there are no

11  objections, and unless the Court has any questions, we request

12  approval of the stipulation.

13          THE COURT:  I don't have any questions.  I do note

14  that it came in on expedited notice, but I also understood the

15  nature of the relief that was being sought and that it

16  represented a business deal between partners that

17  certainly -- or between business parties, that certainly seemed

18  to make sense to the Court.

19          In the absence of objection, and acknowledging that

20  the matter was presented on an expedited basis, I would afford,

21  first, the opportunity for anyone that wishes to be heard an

22  opportunity to object or respond to the application.

23          Very well.  In the absence of opposition and again,

24  understanding the nature of the relief requested and a business

25  resolution on an issue that arose in the context of a

1    acquisition of the company, I'm satisfied the debtors have

2    carried their burden and the stipulation is appropriate and

3    warranted and represents the debtors' best business judgment.

4    I'm happy to sign the stip.

5              MR. KNIGHT:  Thank you, Your Honor.  May I approach?

6              THE COURT:  Sure.

7              MR. KNIGHT:  Thank you.

8              THE COURT:  Thank you.  Okay.

9              MR. KNIGHT:  Thank you, Your Honor.

10             That leaves the combined disclosure statement and

11   confirmation of the plan, and I will cede the podium to Mr.

12   Gilhuly.

13             THE COURT:  Great.  Mr. Gilhuly.

14             MR. GILHULY:  Good afternoon, Your Honor.  Peter

15   Gilhuly of Latham & Watkins on behalf of DNIB Unwind, Inc. and

16   DNIB Subsidiary Corporation.

17             Your Honor, with me here in court today are Geoffrey

18   L. Berman, who's the senior managing director of Development

19   Specialists, Inc. and is the debtors' CRO.  I think you

20   approved his retention nunc pro tunc to August 1st.

21             THE COURT:  I did.

22             MR. GILHULY:  Also, Peter Thomson, the senior planner

23   and financial planning analysis of the debtors is here as well.

24   And Randy Lederman, director at the Cowen Group, financial

25   advisor to the debtors is with me as well.

1          THE COURT:  Okay.

2          MR. GILHULY:  Your Honor, you will have noted that we

3   submitted the declarations of Mr. Berman and Mr. Lederman in

4   connection with this hearing.

5          THE COURT:  I've received and reviewed both of those

6   declarations.

7          MR. GILHULY:  I would ask that they be entered into

8   evidence, subject, of course, to the right of cross-examination

9   of any party --

10          THE COURT:  Sure.

11          MR. GILHULY:  -- that wishes to do so.

12          THE COURT:  Let me ask.  Are there any objections to

13   admission of the declarations subject to, of course, the

14   opportunity to cross-examine either Mr. Berman or Mr. Lederman,

15   or both at the appropriate time?

16          Very well.  I'll admit both declarations in support of

17   the debtors' request for confirmation of their plan and

18   approval of their disclosure statement.

19      (Declarations of Geoffrey L. Berman and Randy Lederman in

20   support of confirmation were hereby received into evidence, as

21   of this date.)

22          MR. GILHULY:  Your Honor, we did not receive any

23   objections by the objection deadline, which was last Wednesday.

24   We did receive a letter by email which, I believe, was sent to

25   Your Honor from Mr. John Coleman.

1          THE COURT:  I have a copy and I've reviewed it.

2          MR. GILHULY:  And I know you are -- I believe your

3  clerk had that filed on the docket as of yesterday.

4          THE COURT:  We added it to the docket.  We got it by

5  email, but we ensured that it was placed on the docket, and so

6  I've got it and I think you identified it on the agenda as

7  well.

8          MR. GILHULY:  To my surprise, Your Honor, it appears

9  that Mr. Coleman and his counsel have come.  The debtor -- I

10  won't go into that right now because I think that may be our

11  only thing, but we'll come back to that.

12          THE COURT:  Sure.

13          MR. GILHULY:  We also had a dialogue with Shabby

14  Healthcare Fund, a holder of warrants and a party to a warrant

15  agreement with the debtor.  We have resolved their concerns in

16  language in the order.

17          THE COURT:  Okay.

18          MR. GILHULY:  So I think we have no objections, but

19  I'm assuming we may have one from Mr. Coleman, and I'd like to

20  address that briefly and then let counsel for Mr. Coleman

21  announce, to the extent that you're inclined to hear that, we

22  have had a number of parties who have contacted us about our

23  distribution date and whether FINRA was going to set an ex-

24  distribution date.

25          And Your Honor, the debtor has been in contact with

1   FINRA since the beginning of August about the name change which
2   took a long time.  It was ultimately changed; the CUSIP number
3   was changed.

4          But I think the key thing for this that I think is
5   really related to everyone -- and we got a lot of people who
6   talked about all kinds of things and nobody else filed
7   anything, even though we've had a lot of discussions with
8   FINRA, with DTC, and with others -- I think the kind of whole
9   case here is we filed a 10-Q on August 15th.  That's cited at
10  page 6 of our confirmation brief, Your Honor.  And the
11  disclosure in there said that "under the plan of liquidation,
12  only stockholders of record on August 30th, 2016 are entitled
13  to payment as part of the initial distribution or any
14  additional cash distribution that may occur.  If you purchased
15  our common stock subsequent to August 30, 2016, you will not be
16  entitled to payment as part of the initial distribution or any
17  subsequent cash distribution if our plan of liquidation is
18  confirmed by the bankruptcy court."

19         That language is repeated in that 10-Q and language
20  similar to it including language that says "trading in shares
21  of our common stock during the pendency of our Chapter 11 is
22  highly speculative and poses substantial risk.  Purchasers of
23  our common stock after August 30, 2016 will not receive any
24  cash distributions under the plan of liquidation."

25         That disclosure was made in the August 15th 10-Q.  We

1    subsequently followed up with similar language on August 30th

2    in an 8-K, which is also cited.

3          And Your Honor, I think there's a misimpression in the

4    market which we tried to correct.  We were talking to FINRA

5    extensively, and FINRA decided an issue that they were not

6    going to set an ex-distribution date in this case.  And I can

7    only speculate as to why because they were not forthcoming

8    about their reasons.  But I think it is because their rules

9    require -- and I think this may be the subject in Mr. Coleman's

10   objection -- that when there's a distribution of fifteen

11   percent, or excess, when they have definitive information about

12   the distribution, which has a number of specific disclosures

13   that go with it, they will set an ex-dividend date -- or ex-

14   distribution date.

15         And I can only speculate, but I do know they have not

16   set an ex-date at all, and I don't know when, and if, they

17   will.  They did issue one of their daily list events on the

18   31st of August which said, "Distribution and date amount and

19   pay date TBD.  Distribution will not be quoted ex by FINRA.

20   Please see bankruptcy plan, issuer's SEC filings for additional

21   information."

22         We've also been in contact with DTC, as you know,

23   which holds for many of the holders in this case, and they are

24   prepared to execute the plan as written should the Court

25   confirm it.

1          I think there's --

2          THE COURT:  I understand the mechanics.  I want to

3   make sure I understand it from the debtors' point of view.

4          The mechanics of that distribution as it relates to

5   shareholders is that if you are a shareholder as of the record

6   date, which, I believe, was 8/31 --

7          MR. GILHULY:  8/30.

8          THE COURT:  -- 8/30 -- then you would receive whatever

9   the distribution that class of stakeholders is entitled to

10  receive.  And if you acquired stock through the pinks, I

11  assume, on the 31st or the 1st of September or this morning,

12  the debtor is under no obligation to make a distribution to

13  you.

14         MR. GILHULY:  Exactly.  And DTC, which holds for many

15  beneficial holders, will do what they do; not our business.

16  They're the holder of record.

17         So Your Honor, I think there seems to be a

18  misunderstanding that somehow the debtor had violated FINRA

19  provisions, where we've been talking to FINRA.  FINRA has

20  voiced no objection to us at all.  They have, in -- I think

21  part of the -- I can only speculate as to why there's a

22  misunderstanding among some, and I think it's because this is a

23  case with just a pile of cash and an absolute priority rule.  A

24  lot of the other cases involve reorganizations with exchange of

25  securities, et cetera.  The debtor wanted a very clear date.

1           We have a bar date of August 30.  We wanted -- our

2   record date was clear.  As you know, Your Honor, we followed up

3   on your invitation to have an expedited plan process, and we

4   wanted to distribute money as soon as possible.  And with the

5   disclosure that is in the 10-Q and in the 8-K which makes it

6   very clear that the debtors' position is we don't expect the

7   stock to be worth anything after the 30th, I really don't have

8   sympathy for folks who bought into that, assuming FINRA would

9   set an ex-distribution date when they don't have to.  And I can

10  tell you, there's no private right of action to enforce FINRA's

11  rules, and FINRA does what it wants.  And they haven't voiced

12  any objection to us.

13          So the other thing I would cite to Your Honor is that

14  their -- we have gotten a lot of inquiries on both sides of

15  this, because the market, I think, plays an arbitrage here.

16  Some people think, you know what, if FINRA sets an ex-dividend

17  date -- ex-distribution date later or the judge moves the

18  record date, all of a sudden the stock we bought for almost

19  nothing -- and the stock went down eighty-five percent after

20  this, there's some option value.  We might get something here.

21          We have a lot of people saying on the other side don't

22  you dare do that.  You have a very clear, absolutely clear

23  disclosure about what you meant to do, and we operated in

24  accordance with that.  So any change is going to hurt.  There

25  have been winners and losers here.

1      I will tell you, Your Honor, I had discovered that
2  these are not grandmas (ph.).  These are very sophisticated
3  investors and they're playing an arbitrage, in my view.  And I
4  think we, the debtor, feels we have no dog in this hunt.  We
5  just want to distribute the money in what was a very successful
6  sale -- surprisingly successful.  We want to get it out to
7  folks.  And we don't see -- it's not about keeping a market
8  trading in a matter which is really just about collecting some
9  receivables and other payments, as you're aware, and paying
10  them out to people.  So we want to do that quickly, and we are
11  prepared to do that.
12      So Your Honor, I don't know if you're going to
13  entertain this whole argument, because I think it's been made
14  late and we really doubt --
15      THE COURT:  I don't want to entertain it, and I'm sure
16  that's what you expected.
17      MR. GILHULY:  Yes.
18      THE COURT:  So good effort.  And it's -- the thing is,
19  it's consistent, I think, with my practice, generally.  I
20  don't -- for one thing, from the colloquy that we just had, you
21  are clearly familiar with the issue leading up, so I'm not
22  concerned that the debtor is disadvantaged or blindsided by the
23  issue.
24      And again, I would hear from Mr. Coleman individually,
25  or if he's appeared with counsel, I'm happy to hear -- and he's

1  engaged able counsel -- and I'm happy to hear and proceed on
2  the merits of this.

3          To me, there may be issues of standing, but in terms
4  of the objection, we're going to turn to the objection.  I
5  certainly -- it just would not be my practice to bounce the
6  objection on procedural grounds.

7          Before we turn to the objection, though, I guess I'd
8  like to make sure -- and again, consistent with my practice --
9  what we have is a request for approval of a disclosure
10 statement and confirmation of a plan.

11         MR. GILHULY:  Correct.

12         THE COURT:  And I have the objection.  I think before
13 I turn to Mr. Coleman and his counsel with respect to the
14 concerns that are raised, which, I think, as a practical matter
15 go both to the plan and to the disclosure statement, so the
16 issues are squarely in front of us for purposes of today, I'd
17 like to deal with the debtors' confirmation record as it
18 relates to confirmation and disclosure, make sure we're all
19 squared away there, and then consider the objection in the sort
20 of refined light that we would have.

21         We have admitted both Mr. Lederman's declaration,
22 which, I believe, is -- is that the balloting certification?

23         MR. GILHULY:  Actually, Your Honor, it relates to
24 NOLs.

25         THE COURT:  Right.

1        MR. GILHULY:  It's not an issue but we wanted to make

2    a record.

3        THE COURT:  Right.  And Mr. Berman's declaration.

4        I also note that I did see the debtors' memorandum,

5    which goes through all of the many, many 1129(a) and 1123

6    factors, which, again, I believe from Mr. Coleman's

7    declaration, except with some specific issues, are not in

8    material controversy.  So I'm trying to make sure that we're

9    winnowing wheat from chaff and that we're ready to proceed.

10       I would ask if anyone wishes to be heard with respect

11   to any concerns as to approval of the disclosure statement or

12   confirmation of a plan prior to hearing the issues raised by

13   Mr. Coleman.

14       And I note that I think the agenda reflected that

15   there were informal comments from the Office of the United

16   States Trustee, and Mr. Kenney is here in a very sharp purple

17   bowtie.

18       MR. GILHULY:  Yes.

19       THE COURT:  And so I think I'd like to hear the

20   position of the U.S. Trustee with respect to matters other than

21   Mr. Coleman's objection and those concerns.  I'd be happy to

22   hear from you at the appropriate time on those.

23       Mr. Kenney, good afternoon.

24       MR. KENNEY:  Good afternoon, Your Honor.

25       For the record, Mark Kenney for the United States

1  Trustee.

2          Your Honor, we had extensive conversations over a

3  period of several weeks, really flyspecking the plan.  So it

4  was gone over very carefully, and a number of changes were made

5  in response to my comments and I think, while some of them were

6  cleanup issues, there was -- I think I had only one substantive

7  issue with respect to minimum distributions and they resolved

8  that immediately.

9          THE COURT:  Okay.

10          MR. KENNEY:  And we've had some conversations since

11  then.  I mean, we can address that later, but it's probably

12  been more active in the last two weeks than it was in the prior

13  six.

14          THE COURT:  Fair point.  All right.  Does anyone else

15  wish to be heard?

16          Okay.  Then again, I see with the declaration and the

17  disclosure statement and the memoranda that the debtors'

18  uncontroverted elements of its case have been established, and

19  I think it's appropriate to turn to Mr. Coleman's opposition

20  and concerns related thereto.

21          MR. GILHULY:  We agree.  Your Honor, we did expect for

22  you to hear from Mr. Coleman as is your practice.

23          THE COURT:  Well, I'm pleased to be predictable.

24  That's fine.

25          MR. GILHULY:  I do want to register --

1          THE COURT:  It's part of the job.

2          MR. GILHULY:  I do want to register the debtors'

3   objection to the standing of Mr. Coleman.  Obviously, you can

4   hear from him and rule on that at an appropriate time, but we

5   do think that Mr. Coleman was not a stockholder of the

6   corporation as of the record date, per his own admission in his

7   letter, and we don't believe he has standing to make this

8   argument, but I'll leave that for you.

9          THE COURT:  So noted.  All right.

10          Mr. McGuire, good afternoon.  Good to see you.

11          MR. MCGUIRE:  Good afternoon, Your Honor.  Matthew

12   McGuire on behalf of John Coleman.

13          Your Honor, with me today is David Karp of Schulte

14   Roth & Zabel.  Your Honor, we have not had the opportunity to

15   file pro hac --

16          THE COURT:  I'm happy to hear from Mr. Karp.

17          MR. MCGUIRE:  We'll file it after the hearing.

18          THE COURT:  Okay.

19          MR. MCGUIRE:  Terrific.

20          THE COURT:  Welcome, sir.  Good afternoon.

21          MR. KARP:  Thank you.  Thank you, Your Honor.  David

22   Karp of Schulte Roth & Zabel on behalf of John Coleman.

23   Appreciate the opportunity to address the Court and would

24   appreciate if Mr. Coleman, at an appropriate time, could also

25   address the --

1           THE COURT:  I'd be happy to hear from Mr. Coleman.

2           MR. KARP:  -- the Court.

3           What we have here is the rules in effect today are the

4    FINRA rules, right.  Until confirmation of a plan when a

5    disclosure statement takes place, we're pivoting not to FINRA

6    Rule 11140(b)(1) but (b)(2), which requires that the equity

7    that was traded today, yesterday, after the August 30th

8    proposed record date --

9           THE COURT:  How do I do that in the context of a

10   combined plan and disclosure statement which the rules have

11   been amended to specifically provide and authorize the Court to

12   manage?  Don't I have to set a record date?  How will Mr.

13   Gilhuly conduct his balloting and certification?  How do I know

14   who's got a stake in the plan?  I can't do that at the hearing,

15   right.

16          So I understand the concerns and I've looked -- I

17   mean, I have encountered this issue.  I've certainly not

18   written on it.  I understand some of my colleagues have, and

19   you pointed those out to me which I've looked at, particularly,

20   the Arctic Glacier case.

21          MR. KARP:  Okay.

22          THE COURT:  But how do I deal with that?  So tell me

23   how this works, if you're right.

24          MR. KARP:  So the way that it did, I guess, in the

25   Trump case that we cited --

1          THE COURT:  Right.

2          MR. KARP:  -- we're coming in, we're saying the record

3   date should be close to the effective date of the plan and it

4   should match and be consistent with the FINRA rule which

5   requires that distributions that are twenty-five percent or

6   greater, the value of that security travels with the security

7   until the date it is paid in the form of a due bill.

8          THE COURT:  But how do I run a bankruptcy case?  How

9   do I confirm a plan?  How does this square with Rule 3017?

10          And again, and perhaps -- let's play this string out a

11  couple times --

12          MR. KARP:  Yep.

13          THE COURT:  -- because I understand the FINRA issues

14  that you've identified, and I've studied them, and I understand

15  the legal analysis.  But I want to focus, for a second, on the

16  mechanics of how a case can be presented to me and confirmed

17  within the practice established under the Bankruptcy Code.

18          Look, the idea of people that are no longer holders

19  getting distributions is clearly distasteful to the Court, and

20  that's not -- it's not fair.  It's not what we want to see, but

21  we have a dynamic where a debtor is obliged to propose a plan.

22  That plan must be accompanied by a disclosure statement.

23          We have the -- I wouldn't call it rare, but the

24  nontypical situation here where we've got a disclosure

25  statement and a plan traveling together.

1          So in theory, with the more routine matter, we would
2     have -- we would have approved a disclosure statement in the
3     second week of August, and that would have said the record date
4     is -- and I believe, 3017 says it's the date the judge signs
5     the disclosure statement order, or such other date as the court
6     fixes, right?  Good.

7          So then Mr. Gilhuly takes his plan and sends it out,
8     says this is the record date.  Anybody that's a holder as of
9     this date is entitled to vote and will receive a distribution.
10    That is just the way that this works, okay.  But the fact of
11    the matter is that the trading may continue, whether it's a
12    combined plan and disclosure statement or a two-step, the more
13    traditional two-step.  But I don't think that the distribution
14    follows that because we couldn't get to -- I couldn't confirm
15    the plan.  I don't know who's entitled to vote.

16          MR. KARP:  Well, even if the Court confirmed the 30th
17    as the record date, it should also state that that distribution
18    should be paid consistent with FINRA rules, meaning that that
19    distribution, while paid to owners of the record date, is the
20    property and for the benefit of the owners pursuant to the
21    rules that govern the trade between the buyer and the seller.

22          Same thing where you have a claims trade and you have
23    a record date, and the amounts paid on account of that claim
24    are paid to a seller.

25          THE COURT:  Right.

1         MR. KARP:  And then proceeds --

2         THE COURT:  But claims trading is different, right,

3  because if he's got a claim -- pointing to my law clerk for the

4  record -- and I'm encouraging him not to engage in claims

5  trading, at least until you've been here a few months -- but if

6  he has a claim and then he's contacted by one of these folks

7  and assigns that claim, the debtors' obligation, until they're

8  advised differently, is to make that distribution to him, and

9  usually, there's a separate contractual relationship, or even

10  an indemnity relationship where it travels on.

11         MR. KARP:  And there is a contractual relationship

12  here.  That contractual relationship is that the parties in

13  trading on these platforms agree to be bound by FINRA rules,

14  and the FINRA rules require that the proceeds be -- are for the

15  benefit of the buyer in these instances, right.

16         We have a proposed record date, and we have a binding

17  FINRA rule.  Until the plan is confirmed, that proposed record

18  date does not potentially trump any FINRA rules.  And here, we

19  have an opportunity, as they did in the Trump case, to create a

20  scenario that's consistent among the FINRA rules.

21         THE COURT:  Then tell me how we could have this case

22  today, a combined plan and a disclosure statement, which the

23  Code specifically contemplates and the legislative history

24  encourages courts to consider and employ -- and I believe that

25  I've followed that admonition -- how could we have that?  How

1  could I confirm that plan with a record date of today?  Who's
2  entitled to vote?  How do we determine who votes?  Votes follow
3  the votes and the distributions follow the record date.  We
4  just need to set a date.  And I recognize that there's a
5  tension between the two, but there's a bankruptcy in the middle
6  of this process.

7         MR. KARP:  Then I think what should happen, even if we
8  held the record date, whether it's the effective -- certainly
9  it could be the effective date and parties can vote on a plan
10  without knowing where the ultimate distributions will be paid,
11  but even if we did keep the 30th, we should direct DTC to pay
12  distributions consistent with FINRA rule as opposed to
13  following the debtors' 8-K, or the debtors' disclosure that is
14  inconsistent with FINRA rules.  Right?  Parties --

15         THE COURT:  Let's take a step back.  Let me ask you
16  about the kind of conduct that we would be encouraging.

17         One of the concerns and difficulties in this business
18  is that while in most of the publicly traded debtors we've
19  seen, and we've seen a lot of them, the debtors' securities or
20  stock is promptly delisted on the filing.

21         I just recently had one where it wasn't.  I forget
22  what case that was, but it was actually just recently and it
23  was very unusual.  It was that big oil company, Halcon, I think
24  it was, but that was a prepack:  different animal.  But would
25  I -- in following the path that you describe, doesn't it make

1  it much more of almost a lottery or a casino game or just

2  guessing about where a distribution's going to occur and what

3  time, what day, when should I hold?

4        The idea of encouraging robust trading and activity

5  and frankly, admittedly, speculation in the securities of a

6  liquidating debtor seem to me to be -- I understand the idea of

7  that investment theory and a way to make some money, but I'm

8  not certain that that's what FINRA is attempting to encourage

9  and what the Bankruptcy Code should encourage.

10       MR. KARP:  I think that's right, and I think the

11  speculators for the parties that were selling into the market

12  after the 8-K came out and after 8/30, right.

13       Parties, such as Mr. Coleman, who are in the market

14  knew that there were concrete rules in place on the day that he

15  purchased, and those rules were the FINRA rules.  And

16  11 -- 11164(2)(b) (sic) clearly states that that instrument is

17  going to travel with a due bill, and it's going to be paid for

18  the benefit of --

19       THE COURT:  How do I square that?  All right, I get

20  that, and I read Mr. Coleman's submission which clearly

21  indicates that he investigated this, thought about it, made

22  this decision.  But I am also obliged to assume that he read

23  the debtors' submission as well, filed with the Securities and

24  Exchange Commission that said unequivocally, you are going to

25  get kicked in the teeth if you acquire this after the 31st of

1  August.

2          MR. KARP:  That may have been out there, Your Honor,

3  but it was a proposed plan and a proposed disclosure statement

4  and a proposed record date.  There was no --

5          THE COURT:  And so Mr. Coleman was prepared to --

6          MR. KARP:  So on one hand --

7          THE COURT:  -- take the risk.  He said I've read the

8  FINRA rules; I think this is how it plays out.  The debtor is

9  very, very clearly taking an alternative view.  If I'm right,

10  it'll work out great; if I'm not then the consequences which

11  the debtor has squarely laid out before me are going to hit.

12          MR. KARP:  But the debtors' direction goes one step

13  further and looks to direct DTC to pay those holders as of the

14  30th and really make a court order ruling that those proceeds

15  are for their benefit.

16          Many times in the market proceeds are paid to one

17  party, and then turned over to another party.  And here we're

18  just saying at the very least we want clarity, that even if the

19  proceeds are paid to party A that doesn't eviscerate party A's

20  agreement, it's FINRA agreement, with the market.  So that the

21  rights to those proceeds, while they may be paid to one party,

22  are for the benefit of another.  And that was --

23          THE COURT:  But there's a mechanical issue there

24  though, which is where the -- it's an interesting issue.  But

25  there's a mechanical problem with that, which is where the

1    analogy to claims trading fails.  And that is that claims

2    trading isn't a blind process driven by beneficial holders and

3    record holders; claims traders deal with each other.

4            So I assume that Mr. -- and if I'm wrong tell me, but

5    I assume Mr. Coleman has no idea who the actual holder of the

6    stock that he purchased was.  I didn't call his neighbor who

7    said I have here on my kitchen table 10,000 shares of BIND, he

8    went to the marketplace.  So he doesn't know.

9            MR. KARP:  That's correct, Your Honor.  But that

10   seller did know that they were bound by the FINRA rules.  And

11   by selling into this market knowing they were bound by the

12   FINRA rules, and seeing the debtors' disclosure statement, they

13   were speculating that they could double-dip.  That they could

14   receive the proceeds and the payment from selling their stock,

15   but would also be able to hang onto those proceeds and not turn

16   them over to their rightful owner when they were paid out by

17   the debtors.

18           THE COURT:  And that's a fair point.  I mean, you're

19   kind of right back to me with the question of what sort of

20   conduct or behavior is it that I'm to encourage.  You're right,

21   I've got somebody's that's got a security and then finds

22   somebody else who's willing to purchase it and do I want to

23   encourage that sort of behavior?

24           MR. KARP:  And I don't think we do.  I think this

25   comes down to there was a rule in place before your gavel comes

1  down on this disclosure statement.  And I understand the

2  details and the mechanics of the record date concept, and the

3  voting concept.  But until that gavel comes down, it's a

4  proposal.  It's a business plan in front of the Court that can

5  be objected to, that can be withdrawn, that can be changed.

6  When the subject trades were entered into, there were clear and

7  binding contractual rules in place.

8          THE COURT:  Again, there were also -- this is not a

9  blind exercise, there's a collection of rules, but there's an

10  affirmative decision to purchase the securities of a company

11  that's in reorganization.  And it's -- it seems to me that

12  there's a disconnect there.  When you have, again, a -- look,

13  no plan is final until I confirm it, but somebody's gambling

14  that it's going to -- that's it's not going to happen.  And if

15  it happens then the consequences anticipated or described by

16  the debtor occur.  And if I don't confirm the plan then Mr.

17  Gilhuly and the debtor go back to square one, and they need to

18  bounce out a disclosure statement again and a new plan.

19          So here's the -- the thing is it was a -- it was

20  a -- I'm not trying to be disparaging, it was a gamble that the

21  Court would not approve the disclosure statement, or do as

22  requested by the debtor.  And again, it's a terrific bet if the

23  disclosure statement gets denied, and here's another example.

24          We've got lots of cases that don't necessarily bring

25  this issue to bear.  But we have a distribution to general

1  unsecured creditors.  So we'll leave FINRA out of it, all

2  right.  And these are claims, okay.  But we all know claims

3  traders and they're looking at it.  And the debtor has a plan

4  that provides for two percent over the next five years in

5  hoped-for recoveries from Chapter 5 litigation, right.  Sadly,

6  not an unusual proposition.  And you've got people that will

7  bet, or acquire, on the basis that, you know something, I think

8  the committee's objecting to this, and I think the committee is

9  going to squeeze cash out of the lender, and I think -- and

10  we've been doing this a long time, somebody that sits in a room

11  goes you know something, two percent, nickel gets it done, and

12  you've more than doubled your money.  So you buy -- you pay for

13  that interest at two percent.  But if you're not right, you're

14  holding a security that has a two percent distribution as

15  promised by the debtor.  And so that's the thing I'm kind of

16  struggling with.

17        Now, you're right, FINRA is an overlay on top of that

18  that gives your perhaps a different argument, or a different

19  level of competence that something other than what the debtor

20  is requesting is going to get approved.  But it still seems to

21  be little more than a gamble.

22        MR. KARP:  Your Honor, if I may, can I give you an

23  example --

24        THE COURT:  Please.

25        MR. KARP:  -- and compare this to a claims trade?

1          I'm sorry, sir, I forgot your name again.

2          THE COURT:  You know something; let's not have him

3    dabbling in securities.

4          MR. KARP:  Okay.

5          THE COURT:  Have it be Mr. Kenney.

6          MR. KARP:  So Mr. Kenney and I enter into a claims

7    trade.  And Mr. Kenney is the creditor of the debtors, and the

8    record date is August 30th.  And after August 30th I agree to

9    purchase Mr. Kenney's claim.  And in our claims trade agreement

10   one of the provisions that will be in there is a turnover

11   provision, right, that the amounts paid on behalf of Mr. Kenney

12   are going to be turned -- are for my benefit, he's got better

13   legal title, all the --

14         THE COURT:  Yep.

15         MR. KARP:  -- bells and whistles, and he's going to

16   determine --

17         THE COURT:  And if the check comes to him, he's got to

18   send it to you.

19         MR. KARP:  And so what has happened here is the

20   debtors have set that record date, but they've also stepped one

21   step further and said you know what, Mr. Kenney, Mr. Karp,

22   we're going to reach into your agreement and we're going to

23   make a court order saying that Mr. Kenney gets to keep those

24   proceeds, right, because my client had an agreement, he had

25   that claims trade agreement in place that governed his rights

1  to those proceeds.  But now what the debtors are saying, not
2  only are we setting a record date, but we're giving DTC, who is
3  going to receive -- likely receive those proceeds, cover to pay
4  the wrong person, and give the wrong person the right to
5  maintain -- to retain those proceeds and double-dip.  So we're
6  going to be left in a situation where we have to potentially
7  look to DTC, look -- try to look through and find that counter-
8  party and recoup that proceeds.  But it's clear that the market
9  rules with respect to the trade are the FINRA rules, and
10 they're analogous to that trades claim agreement, and that the
11 debtors can certainly set the record date, but not who's
12 ultimately entitled to hold onto those proceeds.
13         THE COURT:  Now let me ask you, it seems like this is
14 moral authority then.  Then is the issue not the record date?
15 Is the issue -- and if there's language in the order that
16 relates to what the debtor is telling DTC to do, I know I've
17 seen that kind of language before, is that what we're talking
18 about?  Because can the debtor say you know something, this is
19 my record date, I'm the debtor, Mr. Gilhuly knows exactly who
20 his balloting creditors are, his balloting interest holders,
21 and I think he was pretty clear, we don't care.  We're making a
22 distribution; I don't care who gets it.  But you can't monkey
23 with my record date, because I can't confirm without that, and
24 Judge, I can't set the record date at the effective date or the
25 bankruptcy system doesn't work for purposes of confirming my

1  plan.

2          So I think I'd like to know -- and of course, I will

3  hear from Mr. Gilhuly in specific response -- but I think I'd

4  like to know is what you're saying, Judge, it didn't say

5  anything about DTC, just the record date is this, Mr. Gilhuly

6  has the votes to confirm his plan, and DTC will do what it

7  does.

8          MR. KARP:  Well, I think we -- we don't want --

9          THE COURT:  What do I do with that?

10         MR. KARP:   -- we don't want DTC to do what it does,

11 we want DTC to pay the rightful holder consistent with the

12 FINRA rules.

13         THE COURT:  Okay.

14         MR. KARP:  Your Honor, can I have a moment to talk --

15         THE COURT:  Of course --

16         MR. KARP:  -- with Mr. Coleman --

17         THE COURT:  -- sure.

18         MR. KARP:  -- just one moment.

19         THE COURT:  Absolutely, take your time.

20         MR. KARP:  Thank you.

21     (Pause)

22         MR. KARP:  Thank you, Your Honor.

23         Yeah, I think that's right.  It's about honoring the

24 agreement.  In this situation trade buyers and sellers sign up

25 to trade on a platform.  And when they sign up to trade on that

1    platform they sign a contract to agree with the rules of a

2    platform, and here it's the FINRA rules, and it's that claims

3    trade contract.  And whether those proceeds are paid to DTC and

4    then paid out -- turned over in a manner consistent with the

5    FINRA rules, that's okay.  The record date is part of the issue

6    and we do think should have been set forward and closer to the

7    effective date.  But at the end of the day, it's about getting

8    the right result and not having the debtors come in and trump

9    that agreement between counterparties.

10           I also would request, Your Honor, if you might indulge

11   Mr. Coleman for a moment, to address the Court about how these

12   trades have impacted the market, and just what he has seen in

13   the market with respect to buyers and sellers trading after the

14   8-K was filed.

15           MR. GILHULY:  Your Honor, we would object to --

16           THE COURT:  Mr. Gilhuly, your objection is at least

17   preliminarily overruled, but hang onto it.

18           I'll hear from Mr. Coleman.  I want to be clear, I'm

19   hearing from Mr. Coleman as a party, and as a courtesy.  He's

20   represented, so I'm not obliged to hear him.  But I appreciate

21   his engagement in this process.  But what you described sounds

22   very close to both anecdotal, fact, and expert testimony, and

23   this hearing goes in a different direction.

24           If you -- I think I understand the issues.  I

25   understand at least generally the potential consequences,

1  but -- and so, Mr. Coleman, I will hear you, but I want to be

2  clear, I'm not interested in learning that there are lots of

3  people that have done this; Mr. Coleman stands before me.  And

4  absent additional evidence the fact that there are other

5  participants doesn't really change the nature of the issue for

6  me, I understand the issue.  But I think I'd be happy to hear

7  from Mr. Coleman, and Mr. Gilhuly, keep your powder dry.  Okay.

8        MR. GILHULY:  Your Honor, just for the record, if I

9  may, it sounds a lot like testimony --

10        THE COURT:  Sure it does.

11        MR. GILHULY:  -- and I would want to cross-examine Mr.

12  Coleman on lots of issues if he's going to get into that.

13        THE COURT:  So what's your --

14        MR. GILHULY:  I'm not sure it's relevant, and I'm not

15  sure that it's appropriate.

16        THE COURT:  We'll keep -- one of two things is going

17  to happen.  I'll listen to Mr. Coleman.  I expect from

18  counsel's comments that it would be likely brief.  And I think

19  what I'm going to do is the following.

20        Mr. Coleman, I'll give you a heads up, if you're

21  heading into areas that are going to wind you up in the witness

22  stand I'll let you know.  And I would give Mr. Gilhuly time and

23  latitude to conduct a robust cross.  But again, I don't think

24  that the facts here are in very significant dispute.  So we'll

25  go from there.

1          MR. KARP:  Your Honor, if I may, let me just take

2   fifteen seconds.

3          Thank you, Your Honor, we're just going to withdraw

4   our request.

5          THE COURT:  Okay.

6          MR. KARP:  Mr. Coleman, take a seat.

7          THE COURT:  And again, I do want to observe that at

8   first I anticipated Mr. Gilhuly's objection.  But again, I've

9   allowed the filing because I think it's part of my

10  responsibility to allow stakeholders to appear, to be heard,

11  and for me to consider these issues.  And so it is -- I commend

12  Mr. Coleman for engaging able counsel, because that really

13  makes the process -- and I'm not -- I'm not blowing smoke at

14  anybody.  It is easier to deal with these issues through

15  lawyers, because that's the process.  But I do believe that

16  your instincts were right, this would get very complicated very

17  quickly with your client at the stand.  No offense, but

18  that's -- that's where we're headed.

19          So I'll hear from Gilhuly.

20          MR. KARP:  I'm sorry, sir, may I make one final point,

21  sir?

22          THE COURT:  Oh, yeah, sure.

23          MR. KARP:  The final point is that it is important not

24  to stay silent on this issue.  I think it's important,

25  especially in light of the 8-K being out there.  If we remove

1  any direction of where payment is to be made, we're inviting

2  litigation, potentially, of DTC, potentially against

3  counterparties.  I think it's important to say, and we can say,

4  and I think it's consistent with the Trump holding, that this

5  plan is directing payment to record-date holders to be

6  distributed in a manner consistent with the rules or underlying

7  contracts of those parties.  I think we can take -- and the

8  FINRA rules have been addressed before, and certainly, we're

9  happy to provide the debtors with language, but I think it's

10 about taking this all the way there.

11       And you said to kind of talk about disincentivizing

12 speculators, I do believe that the speculation was a party that

13 approached the market, knew the rules, saw a potential overlay

14 with a proposed bankruptcy plan, took the proceeds from a

15 purchaser, and then held out hope that they would have the

16 opportunity to be unjustly enriched by a second distribution

17 from the debtors that they would not have to turn over

18 consistent with FINRA rules.

19       THE COURT:  Okay, I understand.

20       MR. KARP:  Thank you.

21       THE COURT:  Mr. Gilhuly.

22       MR. GILHULY:  Your Honor, I bear no ill will towards

23 Mr. Coleman, because he hails from hometown of Cos Cob,

24 Connecticut.  But I will tell you that I don't think the

25 parties on either side, and we've been contacted by a lot of

1  them, either one was acting as white knights here.

2           On the one hand you have folks who are going to get

3  distributions and want to sell their stock into the market.

4           On the other hand you have people who are buying it.

5           The stock dropped eighty-five percent for very little

6  money expecting to get a large multiple of that.  And --

7           THE COURT:  But I think Mr. Karp pointed this out, and

8  I'm interested in your response.

9           MR. GILHULY:  Yep.

10           THE COURT:  I get it.

11           MR. GILHULY:  But Your Honor, let me continue, and

12  then -- 'cause there's more to this that I think once you look

13  at it you see Mr. Coleman in his letter says the ex-date can

14  only -- he's quoting Judge Gross -- "the ex-date date can only

15  be set by FINRA and determines which unit holder is ultimately

16  is entitled to the distribution."  FINRA has decided here, on

17  full disclosure, not to set an ex-date.  The gamble that Mr.

18  Coleman made, was that there's an ex-date that FINRA would send

19  in accordance with its rules.  They're not doing that, there

20  was no private right of action under FINRA.  And now Mr.

21  Coleman is trying to get you to set an ex-date that's

22  different, and that FINRA's not doing.  That contract they're

23  telling that's in there, they can't enforce the way they want

24  to.

25           THE COURT:  Let me ask you a question.  Circle back to

1    I think what Mr. Karp and I spent -- Karp, right, Karp?

2              MR. KARP:  Yes.

3              THE COURT:  What Mr. Karp and I spent a fair amount of

4    time on.

5              So we talk about -- and this is a broader topic.  But

6    we talk about the kind of behaviors that we want to reward or

7    encourage, et cetera.  And in some ways, as this has been

8    described to me, I mean the phrase that crosses my mind is a

9    "pox on all of your houses" --

10             MR. GILHULY:  Yes.

11             THE COURT:  -- right, because I have two separate

12   communities.  I have folks that purchased, and I have to assume

13   purchased with eyes open, having read a submission that says,

14   if you acquire a security on the 31st of August it is

15   worthless, you will receive nothing, and say that's a plan I'm

16   looking for.  Okay, that's one side.

17             The other side is I'm going to find -- today is the

18   31st of August, I have -- I've already charted that I'm going

19   to get my distribution because Mr. Gilhuly and Dean won a

20   homerun in an auction, god bless Pfizer -- Pfizer right?

21             MR. GILHULY:  Pfizer, yes.

22             THE COURT:  And I'm going to get that distribution.

23   And now I'm going to find some dolt to buy my stock for

24   nothing.  This has like a nineteenth century feel to it.  This

25   has like a Jay Gould kind of market manipulation to it.

1        MR. GILHULY:  Well, not only that, but Mr. Knight

2 quoted a rapper saying "more money, more problems", Your Honor.

3 I think that's where we are here.

4        THE COURT:  Let me ask you some specifics then.  Am I

5 right -- so this is a softball, you heard me with Mr. Karp

6 saying I don't understand how this works.  If you are right,

7 and I'm setting record dates, and doing all of that on a post-

8 confirmation basis, how does that work under the Bankruptcy

9 Code?  Am I mistaken, I mean is this process actually easily

10 manageable that you could set that mechanic subsequent to this,

11 subsequent to the effective date, or subsequent to

12 confirmation?

13        MR. GILHULY:  The record date you're saying?

14        THE COURT:  Yeah.

15        MR. GILHULY:  Your Honor, we cannot retract a 10-Q

16 that we put out there.  We looked at this situation, said this

17 is going to be very murky.  This is a hard thing to do.  We

18 need to take a clear position because we don't have the ability

19 to stop the stock from trading, and FINRA won't do it until

20 after you're done with everything.

21        So now moving a record date -- and by the way the

22 Trump folks got into this terrible problem, where they tried to

23 move the record date twice, and then they switched position

24 from our position.  Oddly enough, Mr. Coleman is arguing the

25 opposite of what happened in Trump, because in that case, the

1  record holders -- there was a ruling, and it got affirmed by
2  the Third Circuit, got -- were entitled to be paid.  They had a
3  double caning problem there.

4         We needed clarity, and we don't think we can set the
5  record date -- the only way to actually just have a record date
6  a bit after all of this, and we thought because all we have is
7  a pile of cash, we want clear record date, the end of time for
8  the bar -- you know our bar date, and everything else is August
9  30, we want to send money out right away.  And we don't
10  think -- we didn't think the market needed to be trading
11  on -- and we get questions every day.  People are trying to
12  figure out, basically want nonpublic information about a
13  liquidating carcass.  I mean, it's ridiculous.

14        And we took a clear position as to how it ought to
15  work.  And we said, the market knows this, we talked to FINRA,
16  they didn't have a problem with it.  We have talked to DTC.  We
17  are not instructing DTC what to do.  We are simply going to
18  send -- we're telling them what the mechanics are, and
19  obviously it's subject to the Court approval.  And they're
20  going to do what they do.  They are the record holder.

21        THE COURT:  Let me ask you, why is this case
22  different -- I don't want to go all Passover on you, but why is
23  this case different from all other cases, because there are
24  not -- there's no shortage of cases that have a distribution
25  even to equity in this Court.  Often it's associated with a

1  home run, but you know, there are cases, and we have plans that

2  have distributions.  And the standard process is dates are set,

3  and you'll get a distribution, but the company is liquidating,

4  the stock is going to get wiped out, and we're going to

5  distribute as of Ex-date -- not Ex-date, but as of a date

6  certain.  Why is this different?

7          I've dealt with this issue tangentially, and I realize

8  my colleagues may have dealt with it front and center.  But I'm

9  always perplexed when what seems like a -- when a concern is

10 raised, and a significant concern is raised, and yet it

11 identifies a context that appears in many, many, if not all,

12 cases, they don't all have this distribution, but every case

13 has a distribution mechanism and a deadline, and everything

14 else, what's different here, what am I missing?

15         MR. GILHULY:  I just think the difference is that it's

16 a public case, it's a liquidation.  Like a true liquidation.

17 Trump, for example, was -- you know they're reorganizations,

18 right.

19         THE COURT:  Reorg.

20         MR. GILHULY:  And I think the problem is this is the

21 end of time, like we are at the end.  And all we have is cash

22 to send out, and people want to keep trading, right,

23 after -- you know right up to some date.  And the problem for

24 us, as you say, with this expedited process we need certainty,

25 we need to know who we're sending stuff to.  We need to set

1  this date, and we need to have it stick, and we need a clear

2  rule.  Because you have somewhat of a clash of the bankruptcy

3  liquidation --

4          THE COURT:  Can I ask you a question?

5          MR. GILHULY:  Yeah, sure.

6          THE COURT:  Circle back to the beginning of the

7  discussion with Mr. Karp.  And I acknowledge that this

8  situation is perhaps made more complicated by the fact that

9  you've got a combined disclosure statement and plan.  And you

10  are correct, you reminded me, as I've done on many occasions I

11  encouraged it, because I read the Code, I read the amendments,

12  I read the encouragement that we got to do this.  And saving

13  six, eight, ten weeks in a bankruptcy case is often a lot of

14  money, and you had money to distribute.  So that's -- at least

15  on that my conscience is clear.

16          But would you be in the same situation if you had been

17  in front of me in the first week of August saying Judge,

18  approve the disclosure statement, please, today is August 5th,

19  set the record date as August 5th, which is what I've seen in

20  every single disclosure statement I've ever signed, and then

21  we're today at a confirmation hearing.  Would Mr. -- and I

22  haven't enjoined trading in the stocks, so presumably that

23  would occur, but you'd have that order.

24          MR. GILHULY:  You have the certainty.

25          THE COURT:  Is that the issue?  Is that the

1    difference?

2              MR. GILHULY:  I think that's part of it, yes.  I think

3    that's part of it.  Some people are taking the position that

4    our --

5              THE COURT:  But wouldn't we have the same issue?  I

6    mean, again, I'm not going to put words in somebody's mouth.

7    But wouldn't somebody say so --

8              MR. GILHULY:  Yes, we would have the same issue.

9              THE COURT:  -- because you could have an investor who

10    says well, I know that this judge in Delaware signed an order

11    that says this, but Congress said this.  And so I'm going to

12    make a bet that Congress wins in an arm wrestling with Judge

13    Shannon.  And that's a bet, I understand.  So you would have

14    the same issue.

15              MR. GILHULY:  Yes, you would.

16              THE COURT:  Then why don't I see this all the time?

17    And it's not just about a liquidating -- I mean, we've had

18    distributions in these kind of cases.  And maybe it's not an

19    entirely fair question, but when this sort of thing comes up,

20    often counsel stands at that podium and says this is a wacky

21    consolation of circumstances.  We've got foreigners and we've

22    got transaction, and a unique asset, and you'll never see this

23    again.  But you are making a distribution as a result of a

24    robust good sale.  I have another case, AgFeed, that has a

25    precisely similar situation.  Public stock, a lot hairier, I

1  mean it was a victim of this Chinese reverse merger, and all

2  this other stuff.

3            MR. GILHULY:  I'm aware of that case, yes.

4            THE COURT:  Oh, were you in it?

5            MR. GILHULY:  We were the largest creditor I think,

6  Your Honor.

7            THE COURT:  Okay.

8            MR. GILHULY:  Latham Watkins was.

9            THE COURT:  Okay.  Oh, yeah.

10           MR. GILHULY:  Yeah.

11           THE COURT:  All right.  I do remember now.

12           Well, my point is this, it's not about AgFeed, it's

13  about the fact that this -- this does not seem to me to be a

14  remarkable constellation of circumstances, and yet, I don't see

15  this issue every day.

16           MR. GILHULY:  Let me tell you -- let me just offer

17  this on that, Your Honor.  We were an inch away from this not

18  being an issue at all today.  We had lots of conversation with

19  people, we had people -- we even hired lawyers and talked a

20  little bit, everybody else went away.  Mr. Coleman just wrote a

21  letter late, and he's hired lawyers that greatly surprised me,

22  but if they didn't show up this would be another case in that

23  category.

24           THE COURT:  Fair point, okay.

25           MR. GILHULY:  That's pretty much what I can tell you.

1          By the way, I was surprised to learn of all
2   these -- there's a bunch of cases on this, and there's a bunch
3   of plans that do exactly what we've done.  And people either
4   object to them or not.  My personal feeling from talking to
5   some of these folks is there's a lot of speculators who play
6   this game on both sides.  And they care about it.  And it just
7   happens that one of them came forth to you today.

8          THE COURT:  I understand.

9          MR. GILHULY:   A lot of people were absolutely adamant
10   and then went away.

11          THE COURT:  Okay.

12          MR. GILHULY:  On both sides, by the way, a lot of
13   people are encouraging us don't you dare change the clear rule
14   that you put out there.  We get a lot of that.

15          THE COURT:  Mr. Karp, do you wish to reply briefly?

16          MR. KARP:  Thank you, Your Honor.  Just a couple of
17   points.

18          THE COURT:  Sure.

19          MR. KARP:  FINRA's silence here is not applicable
20   because we're in the range of a 11142(b)(2), not (b)(1), where
21   the value being distributed here is in excess of twenty-five
22   percent or greater of the subject securities.  So that
23   automatically flips the distribution to be for the account of
24   what would be the buyer in this situation.

25          Secondly, what's objectionable here, right, is

1   that -- and different from other situations that I've seen, is

2   it's talking about buyers are specifically not entitled to.

3   There's one thing to talk about paying someone on a record

4   date, but it's another thing to kind of take away the right to

5   eviscerate that contract between me and Mr. Kenney.

6          Third, I think going back to the facts of the Trump

7   case, there were two requests to move the record date.  And the

8   first one was at the disclosure statement hearing, where the

9   record date -- the record date was moved from February 9th to

10  March 28th, because the February 9th record date was

11  inconsistent with FINRA rules.  Once the confirmation order was

12  entered, the debtors came back around, which is part of the

13  subject case, and asked to move the record date again to May

14  20th, and that was the subject of litigation, and that's what

15  the court denied.

16         We're right up front -- we're asking for a result that

17  just creates consistency with FINRA rules, that's it.

18         THE COURT:  Okay.  Does anyone else wish to be heard?

19         All right.  I need a few minutes, I will return in a

20  moment.  Stand in recess.

21         MR. SARFATY:  I'm sorry, hello?

22         THE COURT:  Hello?

23         MR. SARFATY:  Hello?

24         THE COURT:  Yeah, this is Judge Shannon.

25         MR. SARFATY:  Hi, Your Honor, I'm sorry.  My name is

1   Moshe Sarfaty, I was told that I will be able to speak in the

2   hearing.

3           THE COURT:  Okay.

4           MR. SARFATY:  I just want to point out just what you

5   said about behavior, that we want to encourage and discourage.

6   That goes to -- he said there was a comment about officers.

7   Officers is a real (indiscernible) profit.  People who bought

8   the stock after the supposed record date, they are not

9   officers, just they bear all the risk.  The people who sold

10  after that date, the other, they are the ones who created an

11  albatross -- who has an albatross, because if the ruling

12  stands, they get all their distribution money, and if not, then

13  they get nothing because they sold their share already, and

14  they're supposedly post-denial price.

15          So the computation that Mr. Gilhuly is trying to make

16  is out of place.  That's the one thing.

17          The second thing is the stock market, the people who

18  buy and sell there, play by a set of rules.  And the rule is

19  that you can't set an ex-date (indiscernible).  We know that

20  there are situations where a case is -- you know, it's a

21  different case, and we understand but it's over there, chambers

22  concerned before that date, and that's why the date was

23  carried.

24          This case is different; the plan is not confirmed yet.

25  So when a market -- when (indiscernible) goes to the market, he

1  checks and to see there's no ex-date, that's fine; I'll buy the

2  stock.

3          THE COURT:  Am I not, sir, obliged to assume that the

4  market participant has also done some basic investigation and

5  has seen the debtors' disclosure that says that acquisition of

6  this stock on or after this date is the acquisition of a

7  security that will receive no value?

8          MR. SARFATY:  Well, a few things about that.

9          First of all, just the fact that the debtor wrote

10  that, and then he doesn't mean that in either case.  If that

11  violates market rules then, you know, with all due respect to

12  what is written that's not going to stand.

13          And the second thing is if you assume that the market

14  participant has made his -- has done his research, and read

15  that disclosure, you can also assume that he read the

16  precedent, the precedent or is (indiscernible), and read the

17  Artic Glacier case, and he knows that if the plan is not

18  confirmed then the debtor there (indiscernible) the

19  (indiscernible) set a record date will have to reschedule it.

20          THE COURT:  All right, I understand.  Okay.  I want

21  the opportunity to review my notes for a few minutes.  I will

22  return and rule.  We stand in recess.  Thank you.

23          MR. GILHULY:  Thank you.

24  (Whereupon these proceedings were concluded at 2:12 PM)

25

1

2                          **I N D E X**

3

4                      **E X H I B I T S**

5  DEBTOR'S    DESCRIPTION                      PAGE

6          Declarations of Geoffrey L.          9

7          Berman and Randy Lederman

8          in support of confirmation

9                            RULINGS

10                                      PAGE    LINE

11  Debtors' Motion for Entry of an Order      8       4

12  Approving Stipulation By and Between DNIB

13  Unwind, Inc. and Comerica Bank, approved

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4   I, Ellen S. Kolman, certify that the foregoing transcript is a

5   true and accurate record of the proceedings.

6

7

8

9                                          September 22, 2016

10  _____     _____

11  ELLEN S. KOLMAN                      DATE

12  AAERT Certified Electronic Transcriber (CET**D-568)

13

14  eScribers, LLC

15  700 West 192nd Street, Suite #607

16  New York, NY 10040

17  (973)406-2250

18  operations@escribers.net

19

20

21

22

23

24

25

**A**

**ability (1)**
39:18
**able (4)**
16:1;27:15;35:12;
47:1
**absence (2)**
7:19,23
**absent (1)**
34:4
**absolute (1)**
13:23
**absolutely (3)**
14:22;32:19;45:9
**accompanied (1)**
21:22
**accordance (2)**
14:24;37:19
**account (4)**
6:15,22;22:23;
45:23
**acknowledge (1)**
42:7
**acknowledging (1)**
7:19
**acquire (3)**
25:25;29:7;38:14
**acquired (1)**
13:10
**acquisition (3)**
8:1;48:5,6
**acting (1)**
37:1
**action (2)**
14:10;37:20
**active (1)**
18:12
**activity (1)**
25:4
**actual (1)**
27:5
**Actually (4)**
16:23;24:22;39:9;
40:5
**adamant (1)**
45:9
**added (1)**
10:4
**additional (3)**
11:14;12:20;34:4
**address (6)**
5:15;10:20;18:11;
19:23,25;33:11
**addressed (1)**
36:8
**admission (2)**
9:13;19:6
**admit (1)**
9:16
**admitted (1)**
16:21

**admittedly (1)**
25:5
**admonition (1)**
23:25
**advised (1)**
23:8
**advisor (1)**
8:25
**affirmative (1)**
28:10
**affirmed (1)**
40:1
**afford (1)**
7:20
**afternoon (8)**
5:4,5;8:14;17:23,
24;19:10,11,20
**again (17)**
7:23;15:24;16:8;
17:6;18:16;21:10;
28:8,12,18,22;30:1;
34:23;35:7,8;43:6,
23;46:13
**against (1)**
36:2
**agenda (5)**
5:14,16;6:8;10:6;
17:14
**AgFeed (2)**
43:24;44:12
**agree (4)**
18:21;23:13;30:8;
33:1
**agreement (10)**
10:15;26:20,20;
30:9,22,24,25;31:10;
32:24;33:9
**albatross (2)**
47:11,11
**allow (1)**
35:10
**allowed (1)**
35:9
**almost (2)**
14:18;25:1
**along (2)**
5:6;6:12
**alternative (1)**
26:9
**always (1)**
41:9
**Amanda (1)**
5:6
**amended (1)**
20:11
**amendments (1)**
42:11
**among (2)**
13:22;23:20
**amount (3)**
6:14;12:18;38:3
**amounts (2)**
22:23;30:11

**analogous (1)**
31:10
**analogy (1)**
27:1
**analysis (2)**
8:23;21:15
**anecdotal (1)**
33:22
**animal (1)**
24:24
**announce (1)**
10:21
**anticipated (2)**
28:15;35:8
**appear (1)**
35:10
**appeared (1)**
15:25
**APPEARING (1)**
4:7
**appears (2)**
10:8;41:11
**applicable (1)**
45:19
**application (2)**
6:4;7:22
**apply (1)**
6:21
**appreciate (4)**
5:25;19:23,24;
33:20
**approach (1)**
8:5
**approached (1)**
36:13
**appropriate (7)**
8:2;9:15;17:22;
18:19;19:4,24;34:15
**approval (5)**
7:12;9:18;16:9;
17:11;40:19
**approve (2)**
28:21;42:18
**approved (3)**
8:20;22:2;29:20
**approving (1)**
6:10
**approximate (1)**
6:13
**arbitrage (2)**
14:15;15:3
**Arctic (1)**
20:20
**areas (1)**
34:21
**arguing (1)**
39:24
**argument (3)**
15:13;19:8;29:18
**arm (1)**
43:12
**arose (1)**
7:25

**around (1)**
46:12
**Artic (1)**
48:17
**A's (1)**
26:19
**asset (1)**
43:22
**assigned (1)**
6:12
**assigns (1)**
23:7
**associated (1)**
40:25
**assume (8)**
13:11;25:22;27:4,
5;38:12;48:3,13,15
**assuming (2)**
10:19;14:8
**attached (1)**
6:19
**attempting (1)**
25:8
**Attorneys (1)**
4:3
**auction (1)**
38:20
**August (21)**
8:20;11:1,9,12,15,
23,25;12:1,18;14:1;
20:7;22:3;26:1;30:8,
8;38:14,18;40:8;
42:17,18,19
**authority (1)**
31:14
**authorize (1)**
20:11
**automatic (1)**
6:20
**automatically (1)**
45:23
**aware (2)**
15:9;44:3
**away (6)**
16:19;40:9;44:17,
20;45:10;46:4

**B**

**b1 (1)**
45:20
**b2 (1)**
20:6
**back (8)**
10:11;24:15;
27:19;28:17;37:25;
42:6;46:6,12
**balloting (4)**
16:22;20:13;
31:20,20
**Bank (2)**
6:10,14
**bankruptcy (11)**

**11:18;12:20;21:8,
17;24:5;25:9;31:25;
36:14;39:8;42:2,13**
**bar (3)**
14:1;40:8,8
**basic (2)**
6:19;48:4
**basically (1)**
40:12
**basis (3)**
7:20;29:7;39:8
**bear (3)**
28:25;36:22;47:9
**beginning (2)**
11:1;42:6
**behalf (4)**
8:15;19:12,22;
30:11
**behavior (3)**
27:20,23;47:5
**behaviors (1)**
38:6
**bells (1)**
30:15
**beneficial (2)**
13:15;27:2
**benefit (6)**
22:20;23:15;
25:18;26:15,22;
30:12
**Berman (3)**
8:18;9:3,14,19
**Berman's (1)**
17:3
**best (1)**
8:3
**bet (4)**
28:22;29:7;43:12,
13
**better (1)**
30:12
**big (1)**
24:23
**bill (2)**
21:7;25:17
**BIND (1)**
27:7
**binding (2)**
23:16;28:7
**bit (2)**
40:6;44:20
**bless (1)**
38:20
**blind (2)**
27:2;28:9
**blindsided (1)**
15:22
**blowing (1)**
35:13
**both (9)**
9:5,15,16;14:14;
16:15,21;33:22;45:6,
12

**bought (3)**
14:8,18;47:7
**bounce (2)**
16:5;28:18
**bound (3)**
23:13;27:10,11
**bowtie (1)**
17:17
**brief (2)**
11:10;34:18
**Briefly (4)**
5:15;6:11;10:20;
45:15
**bring (1)**
28:24
**broader (1)**
38:5
**bunch (2)**
45:2,2
**burden (1)**
8:2
**business (7)**
7:16,17,24;8:3;
13:15;24:17;28:4
**buy (4)**
29:12;38:23;
47:18;48:1
**buyer (3)**
22:21;23:15;45:24
**buyers (3)**
32:24;33:13;46:2
**buying (1)**
37:4

**C**

**call (2)**
21:23;27:6
**came (4)**
7:14;25:12;45:7;
46:12
**can (23)**
12:6,15;13:21;
14:9;18:11;19:3;
21:16;24:9;28:4,5,5;
29:22;31:11,18;
32:14;36:3,7;37:13,
14;40:4;42:4;44:25;
48:15
**caning (1)**
40:3
**carcass (1)**
40:13
**card (1)**
6:22
**care (3)**
31:21,22;45:6
**carefully (1)**
18:4
**carried (2)**
8:2;47:23
**case (28)**
11:9;12:6,23;

13:23;18:18;20:20,
25;21:8,16;23:19,21;
24:22;39:25;40:21,
23;41:12,16;42:13;
43:24;44:3,22;46:7,
13;47:20,21,24;
48:10,17
**cases (8)**
13:24;28:24;
40:23,24;41:1,12;
43:18;45:2
**cash (7)**
11:14,17,24;
13:23;29:9;40:7;
41:21
**casino (1)**
25:1
**category (1)**
44:23
**cause (1)**
37:12
**cede (1)**
8:11
**center (1)**
41:8
**century (1)**
38:24
**certain (2)**
25:8;41:6
**certainly (7)**
7:17,17;16:5;
20:17;24:8;31:11;
36:8
**certainty (2)**
41:24;42:24
**certification (2)**
16:22;20:13
**cetera (2)**
13:25;38:7
**chaff (1)**
17:9
**chambers (1)**
47:21
**change (4)**
11:1;14:24;34:5;
45:13
**changed (3)**
11:2,3;28:5
**changes (1)**
18:4
**Chapter (3)**
5:11;11:21;29:5
**charted (1)**
38:18
**check (1)**
30:17
**checks (1)**
48:1
**Chinese (1)**
44:1
**Circle (2)**
37:25;42:6
**Circuit (1)**

40:2
**circumstances (2)**
43:21;44:14
**cite (1)**
14:13
**cited (3)**
11:9;12:2;20:25
**claim (6)**
22:23;23:3,6,7;
30:9;31:10
**claims (13)**
22:22;23:2,4;27:1,
1,3;29:2,2,25;30:6,9,
25;33:2
**clarity (2)**
26:18;40:4
**clash (1)**
42:2
**class (1)**
13:9
**cleanup (1)**
18:6
**clear (16)**
13:25;14:2,6,22,
22;28:6;31:8,21;
33:18;34:2;39:18;
40:7,14;42:1,15;
45:13
**clearly (5)**
15:21;21:19;
25:16,20;26:9
**CLERK (3)**
5:2;10:3;23:3
**client (2)**
30:24;35:17
**close (2)**
21:3;33:22
**closer (1)**
33:6
**Cob (1)**
36:23
**co-counsel (1)**
5:7
**Code (5)**
21:17;23:23;25:9;
39:9;42:11
**Coleman (36)**
4:3;9:25;10:9,19,
20;15:24;16:13;
17:13;18:22;19:3,5,
12,22,24;20:1;25:13;
26:5;27:5;32:16;
33:11,18,19;34:1,3,
7,12,17,20;35:6,12;
36:23;37:13,18,21;
39:24;44:20
**Coleman's (5)**
12:9;17:6,21;
18:19;25:20
**collateralized (1)**
6:15
**colleagues (2)**
20:18;41:8

**collecting (1)**
15:8
**collection (1)**
28:9
**colloquy (1)**
15:20
**combined (6)**
5:11;8:10;20:10;
22:12;23:22;42:9
**Comerica (5)**
6:10,14,19,21,25
**coming (1)**
21:2
**commend (1)**
35:11
**comment (1)**
47:6
**comments (3)**
17:15;18:5;34:18
**Commission (1)**
25:24
**committee (1)**
29:8
**committee's (1)**
29:8
**common (3)**
11:15,21,23
**communities (1)**
38:12
**company (4)**
8:1;24:23;28:10;
41:3
**compare (1)**
29:25
**competence (1)**
29:19
**complicated (2)**
35:16;42:8
**computation (1)**
47:15
**concept (2)**
28:2,3
**concern (2)**
41:9,10
**concerned (2)**
15:22;47:22
**concerns (7)**
10:15;16:14;
17:11,21;18:20;
20:16;24:17
**concluded (1)**
48:24
**concrete (1)**
25:14
**conduct (4)**
20:13;24:16;
27:20;34:23
**confirm (8)**
12:25;21:9;22:14;
24:1;28:13,16;
31:23;32:6
**confirmation (14)**
5:11;8:11;9:17,20;

11:10;16:10,17,18;
17:12;20:4;39:8,12;
42:21;46:11
**confirmed (6)**
11:18;21:16;
22:16;23:17;47:24;
48:18
**confirming (1)**
31:25
**Congress (2)**
43:11,12
**Connecticut (1)**
36:24
**connection (2)**
6:17;9:4
**conscience (1)**
42:15
**consequences (3)**
26:10;28:15;33:25
**consider (3)**
16:19;23:24;35:11
**consistency (1)**
46:17
**consistent (11)**
15:19;16:8;21:4;
22:18;23:20;24:12;
32:11;33:4;36:4,6,18
**consolation (1)**
43:21
**constellation (1)**
44:14
**contact (2)**
10:25;12:22
**contacted (3)**
10:22;23:6;36:25
**contemplates (1)**
23:23
**context (3)**
7:25;20:9;41:11
**continue (2)**
22:11;37:11
**contract (4)**
33:1,3;37:22;46:5
**contracts (1)**
36:7
**contractual (1)**
23:9,11,12;28:7
**controversy (1)**
17:8
**conversation (1)**
44:18
**conversations (2)**
18:2,10
**copy (1)**
10:1
**Corporation (2)**
8:16;19:6
**Cos (1)**
36:23
**counsel (7)**
10:9,20;15:25;
16:1,13;35:12;43:20
**counsel's (1)**

34:18
counter- (1)
    31:7
counterparties (2)
    33:9;36:3
couple (2)
    21:11;45:16
course (4)
    9:8,13;32:2,15
COURT (124)
    5:3,8,13,20,25;6:6,
    7;7:2,8,11,13,18;8:6,
    8,13,17,21;9:1,5,10,
    12;10:1,4,12,17;
    11:18;12:24;13:2,8;
    15:15,18;16:12,25;
    17:3,19;18:9,14,23;
    19:1,9,16,18,20,23;
    20:1,2,9,11,22;21:1,
    8,13,19;22:5,16,25;
    23:2,21;24:15;
    25:19;26:5,7,14,23;
    27:18;28:4,8,21;
    29:24;30:2,5,14,17,
    23;31:13;32:9,13,15,
    17,19;33:11,16;
    34:10,13,16;35:5,7,
    22;36:19,21;37:7,10,
    25;38:3,11,22;39:4,
    14;40:19,21,25;
    41:19;42:4,6,25;
    43:5,9,16;44:4,7,9,
    11,24;45:8,11,15,18;
    46:15,18,22,24;47:3;
    48:3,20
COURTCALL (1)
    5:23
courtesy (1)
    33:19
courts (1)
    23:24
cover (1)
    31:3
Cowen (1)
    8:24
create (1)
    23:19
created (1)
    47:10
creates (1)
    46:17
credit (5)
    6:13,22,25;7:4,5
creditor (2)
    30:7;44:5
creditors (2)
    29:1;31:20
CRO (1)
    8:19
cross (1)
    34:23
crosses (1)
    38:8

cross-examination (1)
    9:8
cross-examine (2)
    9:14;34:11
CUSIP (1)
    11:2

                D

dabbling (1)
    30:3
daily (1)
    12:17
dare (2)
    14:22;45:13
date (76)
    9:21;10:23,24;
    12:6,13,14,18,19;
    13:6,25;14:1,2,9,17,
    17,18;19:6;20:8,12;
    21:3,3,7;22:3,4,5,8,9,
    17,19,23;23:16,18;
    24:1,3,4,8,9;26:4;
    28:2;30:8,20;31:2,
    11,14,19,23,24,24;
    32:5;33:5,7;37:14;
    39:11,13,21,23;40:5,
    5,7,8;41:5,23;42:1,
    19;46:4,7,9,9,10,13;
    47:8,10,22,22;48:6,
    19
dates (2)
    39:7;41:2
DAVID (3)
    4:4;19:13,21
day (5)
    25:3,14;33:7;
    40:11;44:15
deadline (2)
    9:23;41:13
deal (5)
    7:16;16:17;20:22;
    27:3;35:14
dealt (2)
    41:7,8
Dean (1)
    38:19
debt (1)
    6:22
debtor (25)
    6:10,17;10:9,15,
    25;13:12,18,25;15:4,
    22;21:21;25:6;26:8,
    11;28:16,17,22;29:3,
    15,19;31:16,18,19;
    48:9,18
debtors (15)
    5:9;7:5;8:1,23,25;
    24:18;27:17;30:7,
    20;31:1,11;33:8;
    36:9,17;46:12
debtors' (19)
    6:9,11;8:3,19;

9:17;13:3;14:6;
    16:17;17:4;18:17;
    19:2;23:7;24:13,13,
    19;25:23;26:12;
    27:12;48:5
decided (2)
    12:5;37:16
decision (2)
    25:22;28:10
declaration (4)
    16:21;17:3,7;
    18:16
declarations (5)
    9:3,6,13,16,19
definitive (1)
    12:11
Delaware (1)
    43:10
delisted (1)
    24:20
denied (2)
    28:23;46:15
describe (1)
    24:25
described (3)
    28:15;33:21;38:8
details (1)
    28:2
determine (2)
    24:2;30:16
determines (1)
    37:15
Development (1)
    8:18
dialogue (1)
    10:13
difference (2)
    41:15;43:1
different (13)
    23:2;24:24;29:18,
    18;33:23;37:22;
    40:22,23;41:6,14;
    46:1;47:21,24
differently (1)
    23:8
difficulties (1)
    24:17
direct (2)
    24:11;26:13
directing (1)
    36:5
direction (3)
    26:12;33:23;36:1
director (2)
    8:18,24
disadvantaged (1)
    15:22
disclosure (34)
    5:11;8:10;9:18;
    11:11,25;14:5,23;
    16:9,15,18;17:11;
    18:17;20:5,10;21:22,
    24;22:2,5,12;23:22;

24:13;26:3;27:12;
    28:1,18,21,23;37:17;
    42:9,18,20;46:8;
    48:5,15
disclosures (1)
    12:12
disconnect (1)
    28:12
discourage (1)
    47:5
discovered (1)
    15:1
discussion (1)
    42:7
discussions (1)
    11:7
disincentivizing (1)
    36:11
disparaging (1)
    28:20
dispute (1)
    34:24
distasteful (1)
    21:19
distribute (4)
    14:4;15:5;41:5;
    42:14
distributed (2)
    36:6;45:21
distribution (33)
    10:23,24;11:13,14,
    16,17;12:10,12,14,
    18,19;13:4,9,12;
    22:9,13,17,19;23:8;
    28:25;29:14;31:22;
    36:16;37:16;38:19,
    22;40:24;41:3,12,13;
    43:23;45:23;47:12
distributions (10)
    11:24;18:7;21:5,
    19;24:3,10,12;37:3;
    41:2;43:18
distribution's (1)
    25:2
DNIB (2)
    8:15,16
docket (3)
    10:3,4,5
dog (1)
    15:4
dollars (3)
    6:14,16,23
dolt (1)
    38:23
done (7)
    29:11;34:3;39:20;
    42:10;45:3;48:4,14
double (1)
    40:3
doubled (1)
    29:12
double-dip (2)
    27:13;31:5

doubt (1)
    15:14
down (5)
    6:24;14:19;27:25;
    28:1,3
draws (1)
    6:24
driven (1)
    27:2
dropped (1)
    37:5
dry (1)
    34:7
DTC (16)
    11:8;12:22;13:14;
    24:11;26:13;31:2,7,
    16;32:5,6,10,11;
    33:3;36:2;40:16,17
due (2)
    21:7;25:17;48:11
during (1)
    11:21
dynamic (1)
    21:21

                E

easier (1)
    35:14
easily (1)
    39:9
effect (1)
    20:3
effective (6)
    21:3;24:8,9;31:24;
    33:7;39:11
effort (1)
    15:18
eight (1)
    42:13
eighty-five (2)
    14:19;37:5
either (5)
    9:14;36:25;37:1;
    45:3;48:10
elements (1)
    18:18
else (7)
    11:6;18:14;27:22;
    40:8;41:14;44:20;
    46:18
email (2)
    9:24;10:5
employ (1)
    23:24
encountered (1)
    20:17
encourage (6)
    25:8,9;27:20,23;
    38:7;47:5
encouraged (1)
    42:11
encouragement (1)

42:12

**encourages (1)**
23:24

**encouraging (4)**
23:4;24:16;25:4;
45:13

**end (5)**
7:6;33:7;40:7;
41:21,21

**enforce (2)**
14:10;37:23

**engage (1)**
23:4

**engaged (1)**
16:1

**engagement (1)**
33:21

**engaging (1)**
35:12

**enjoined (1)**
42:22

**enough (1)**
39:24

**enriched (1)**
36:16

**ensured (1)**
10:5

**enter (1)**
30:6

**entered (5)**
5:18;6:5;9:7;28:6;
46:12

**entertain (2)**
15:13,15

**entirely (1)**
43:19

**entitled (10)**
11:12,16;13:9;
22:9,15;24:2;31:12;
37:16;40:2;46:2

**entity (1)**
6:18

**entry (1)**
6:9

**equity (2)**
20:6;40:25

**especially (1)**
35:25

**ESQ (1)**
4:4

**established (2)**
18:18;21:17

**et (2)**
13:25;38:7

**even (8)**
11:7;22:16;23:9;
24:7,11;26:18;
40:25;44:19

**event (1)**
5:10

**events (1)**
12:17

**everybody (1)**

44:20

**everyone (1)**
11:5

**evidence (3)**
9:8,20;34:4

**eviscerate (2)**
26:19;46:5

**ex (1)**
12:19

**ex- (2)**
10:23;12:13

**Exactly (3)**
13:14;31:19;45:3

**example (3)**
28:23;29:23;41:17

**except (1)**
17:7

**excess (2)**
12:11;45:21

**exchange (2)**
13:24;25:24

**exclusive (1)**
5:18

**ex-date (10)**
12:16;37:13,14,17,
18,21;41:5,5;47:19;
48:1

**ex-distribution (3)**
12:6;14:9,17

**ex-dividend (2)**
12:13;14:16

**execute (1)**
12:24

**exercise (1)**
28:9

**expect (3)**
14:6;18:21;34:17

**expected (1)**
15:16

**expecting (1)**
37:6

**expedited (4)**
7:14,20;14:3;
41:24

**expert (1)**
33:22

**expiration (1)**
7:3

**expires (1)**
7:5

**extend (1)**
5:18

**extensive (1)**
18:2

**extensively (1)**
12:5

**extent (2)**
6:24;10:21

**eyes (1)**
38:13

## F

**fact (6)**
22:10;33:22;34:4;
42:8;44:13;48:9

**factors (1)**
17:6

**facts (2)**
34:24;46:6

**fails (1)**
27:1

**Fair (6)**
18:14;21:20;
27:18;38:3;43:19;
44:24

**familiar (1)**
15:21

**February (2)**
46:9,10

**fee (1)**
6:4

**feel (1)**
38:24

**feeling (1)**
45:4

**feels (1)**
15:4

**few (4)**
23:5;46:19;48:8,
21

**fifteen (2)**
12:10;35:2

**figure (1)**
40:12

**file (2)**
19:15,17

**filed (5)**
10:3;11:6,9;25:23;
33:14

**filing (2)**
24:20;35:9

**filings (1)**
12:20

**final (4)**
6:4;28:13;35:20,
23

**finally (1)**
7:3

**financial (2)**
8:23,24

**find (3)**
31:7;38:17,23

**finds (1)**
27:21

**fine (2)**
18:24;48:1

**Finger (1)**
5:6

**FINRA (46)**
10:23;11:1,8;12:4,
5,19;13:18,19,19;
14:8,11,16;20:4,5;
21:4,13;22:18;23:13,
14,17,18,20;24:12,
14;25:8,15;26:8,20;

27:10,12;29:1,17;
31:9;32:12;33:2,5;
36:8,18;37:15,16,18,
20;39:19;40:15;
46:11,17

**FINRA's (3)**
14:10;37:22;45:19

**first (7)**
6:3,20;7:21;35:8;
42:17;46:8;48:9

**five (1)**
29:4

**fixes (1)**
22:6

**Flipping (1)**
6:3

**flips (1)**
45:23

**flyspecking (1)**
18:3

**focus (1)**
21:15

**folks (7)**
14:8;15:7;23:6;
37:2;38:12;39:22;
45:5

**follow (2)**
24:2,3

**followed (3)**
12:1;14:2;23:25

**following (3)**
24:13,25;34:19

**follows (1)**
22:14

**foreigners (1)**
43:21

**forget (1)**
24:21

**forgot (1)**
30:1

**form (1)**
21:7

**forth (1)**
45:7

**forthcoming (1)**
12:7

**forward (2)**
6:3;33:6

**frankly (1)**
25:5

**front (5)**
16:16;28:4;41:8;
42:17;46:16

**full (1)**
37:17

**Fund (1)**
10:14

**funds (3)**
6:21;7:1,4

**further (2)**
26:13;30:21

## G

**gamble (3)**
28:20;29:21;37:17

**gambling (1)**
28:13

**game (2)**
25:1;45:6

**gavel (2)**
27:25;28:3

**general (1)**
28:25

**generally (2)**
15:19;33:25

**Geoffrey (2)**
8:17;9:19

**gets (4)**
28:23;29:11;
30:23;31:22

**Gilhuly (65)**
5:7;8:12,13,14,15,
22;9:2,7,11,22;10:2,
8,13,18;13:7,14;
15:17;16:11,23;17:1,
18;18:21,25;19:2;
20:13;22:7;28:17;
31:19;32:3,5;33:15,
16;34:7,8,11,14,22;
35:19;36:21,22;37:9,
11;38:10,19,21;39:1,
13,15;41:15,20;42:5,
24;43:2,8,15;44:3,5,
8,10,16,25;45:9,12;
47:15;48:23

**Gilhuly's (1)**
35:8

**gives (1)**
29:18

**giving (1)**
31:2

**Glacier (2)**
20:20;48:17

**god (1)**
38:20

**goes (6)**
17:5;26:12;29:11;
33:23;47:6,25

**good (12)**
5:4,5;8:14;15:18;
17:23,24;19:10,10,
11,20;22:6;43:24

**Gould (1)**
38:25

**govern (1)**
22:21

**governed (1)**
30:25

**grandmas (1)**
15:2

**Great (2)**
8:13;26:10

**greater (2)**

DNIB UNWIND, INC.
(F/K/A BIND THERAPEUTICS, INC.), et al

21:6;45:22
**greatly (1)**
44:21
**Gross (1)**
37:14
**grounds (1)**
16:6
**Group (1)**
8:24
**guess (2)**
16:7;20:24
**guessing (1)**
25:2

## H

**hac (1)**
19:15
**hails (1)**
36:23
**hairier (1)**
43:25
**Halcon (1)**
24:23
**hand (3)**
26:6;37:2,4
**hang (3)**
5:20;27:15;33:17
**happen (3)**
24:7;28:14;34:17
**happened (2)**
30:19;39:25
**happens (2)**
28:15;45:7
**happy (8)**
8:4;15:25;16:1;
17:21;19:16;20:1;
34:6;36:9
**hard (1)**
39:17
**headed (1)**
35:18
**heading (1)**
34:21
**heads (1)**
34:20
**Healthcare (1)**
10:14
**hear (16)**
10:21;15:24,25;
16:1;17:19,22;
18:22;19:4,16;20:1;
32:3;33:18,20;34:1,
6;35:19
**heard (6)**
7:21;17:10;18:15;
35:10;39:5;46:18
**hearing (9)**
9:4;17:12;19:17;
20:14;33:19,23;
42:21;46:8;47:2
**held (3)**
6:14;24:8;36:15

**hello (3)**
46:21,22,23
**hereby (1)**
9:20
**here's (2)**
28:19,23
**Hi (1)**
46:25
**highly (1)**
11:22
**hired (2)**
44:19,21
**history (1)**
23:23
**hit (1)**
26:11
**hold (2)**
25:3;31:12
**holder (7)**
10:14;13:16;22:8;
27:5;32:11;37:15;
40:20
**holders (9)**
12:23;13:15;
21:18;26:13;27:2,3;
31:20;36:5;40:1
**holding (2)**
29:14;36:4
**holds (2)**
12:23;13:14
**home (1)**
41:1
**homerun (1)**
38:20
**hometown (1)**
36:23
**Honor (54)**
5:5,10,15,17,18,
23;6:2,4,11,20;7:9,
10;8:5,9,14,17;9:2,
22,25;10:8,25;11:10;
12:3;13:17;14:2,13;
15:1,12;16:23;
17:24;18:2,21;19:11,
13,14,21;26:2;27:9;
29:22;32:14,22;
33:10,15;34:8;35:1,
3;36:22;37:11;39:2,
15;44:6,17;45:16;
46:25
**honoring (1)**
32:23
**hope (1)**
36:15
**hoped-for (1)**
29:5
**houses (1)**
38:9
**hunt (1)**
15:4
**hurt (1)**
14:24

## I

**idea (4)**
21:18;25:4,6;27:5
**identified (2)**
10:6;21:14
**identifies (1)**
41:11
**ill (1)**
36:22
**immediate (1)**
6:25
**immediately (1)**
18:8
**impacted (1)**
33:12
**important (3)**
35:23,24;36:3
**Inc (2)**
8:15,19
**inch (1)**
44:17
**inclined (1)**
10:21
**including (1)**
11:20
**inconsistent (2)**
24:14;46:11
**indemnity (1)**
23:10
**indicates (1)**
25:21
**indiscernible (6)**
47:7,19,25;48:16,
18,19
**individually (1)**
15:24
**indulge (1)**
33:10
**informal (1)**
17:15
**information (3)**
12:11,21;40:12
**initial (2)**
11:13,16
**inquiries (1)**
14:14
**instances (1)**
23:15
**instincts (1)**
35:16
**instructing (1)**
40:17
**instrument (1)**
25:16
**interest (2)**
29:13;31:20
**interested (2)**
34:2;37:8
**interesting (1)**
26:24
**into (13)**

9:7;20;10:10;14:8;
25:11;27:11;28:6;
30:6,22;34:12,21;
37:3;39:22
**investigated (1)**
25:21
**investigation (1)**
48:4
**investment (1)**
25:7
**investor (1)**
43:9
**investors (1)**
15:3
**invitation (1)**
14:3
**inviting (1)**
36:1
**involve (1)**
13:24
**IPmetrics (1)**
6:4
**issue (24)**
7:25;12:5,17;
15:21,23;17:1;18:7;
20:17;26:23,24;
28:25;31:14,15;
33:5;34:5,6;35:24;
41:7;42:25;43:5,8,
14;44:15,18
**issuer's (1)**
12:20
**issues (10)**
16:3,16;17:7,12;
18:6;21:13;33:24;
34:12;35:11,14
**item (4)**
5:14;6:3,8,8
**items (1)**
5:15

## J

**Jay (1)**
38:25
**job (1)**
19:1
**John (5)**
4:3;5:5;9:25;
19:12,22
**Judge (11)**
5:21,21;14:17;
22:4;31:24;32:4;
37:14;42:17;43:10,
12;46:24
**judgment (1)**
8:3

## K

**KARP (50)**
4:4;19:13,16,21,
22;20:2,21,24;21:2,

12;22:16;23:1,11;
24:7;25:10;26:2,6,
12;27:9,24;29:22,25;
30:4,6,15,19,21;
32:8,10,14,16,18,20,
22;35:1,6,20,23;
36:20;37:7;38:1,1,1,
2,3;39:5;42:7;45:15,
16,19
**keep (5)**
24:11;30:23;34:7,
16;41:22
**keeping (1)**
15:7
**Kenney (12)**
17:16,23,24,25;
18:10;30:5,6,7,11,
21,23;46:5
**Kenney's (1)**
30:9
**key (1)**
11:4
**kicked (1)**
25:25
**kind (10)**
11:8;24:16;27:19;
29:15;31:17;36:11;
38:6,25;43:18;46:4
**kinds (1)**
11:6
**kitchen (1)**
27:7
**knew (2)**
25:14;36:13
**Knight (14)**
5:4,5,5,9,14;6:1,2,
7;7:3,9;8:5,7,9;39:1
**knights (1)**
37:1
**knowing (2)**
24:10;27:11
**knows (3)**
31:19;40:15;48:17

## L

**laid (1)**
26:11
**landlord (1)**
6:24
**language (8)**
10:16;11:19,19,
20;12:1;31:15,17;
36:9
**large (1)**
37:6
**largest (1)**
44:5
**last (2)**
9:23;18:12
**late (2)**
15:14;44:21
**later (2)**

14:17;18:11
**Latham (3)**
    5:7;8:15;44:8
**latitude (1)**
    34:23
**law (1)**
    23:3
**lawyers (3)**
    35:15;44:19,21
**Layton (1)**
    5:6
**leading (1)**
    15:21
**learn (1)**
    45:1
**learning (1)**
    34:2
**lease (2)**
    6:12,13
**least (5)**
    23:5;26:18;33:16,
    25;42:14
**leave (2)**
    19:8;29:1
**leaves (2)**
    6:8;8:10
**Lederman (4)**
    8:24;9:3,14,19
**Lederman's (1)**
    16:21
**left (1)**
    31:6
**legal (2)**
    21:15;30:13
**legislative (1)**
    23:23
**lender (1)**
    29:9
**letter (8)**
    6:13,25;7:4,5;
    9:24;19:7;37:13;
    44:21
**level (1)**
    29:19
**light (2)**
    16:20;35:25
**likely (2)**
    31:3;34:18
**line (2)**
    5:21,24
**liquidating (4)**
    25:6;40:13;41:3;
    43:17
**liquidation (6)**
    11:11,17,24;41:16,
    16;42:3
**list (1)**
    12:17
**listen (1)**
    34:17
**litigation (3)**
    29:5;36:2;46:14
**little (4)**

6:15;29:21;37:5;
    44:20
**LLP (1)**
    4:2
**long (3)**
    7:7;11:2;29:10
**longer (1)**
    21:18
**look (7)**
    7:1;21:18;28:12;
    31:7,7,7;37:12
**looked (3)**
    20:16,19;39:16
**looking (2)**
    29:3;38:16
**looks (1)**
    26:13
**losers (1)**
    14:25
**lot (14)**
    11:5,7;13:24;
    14:14,21;24:19;
    34:9;36:25;42:13;
    43:25;45:5,9,12,14
**lots (4)**
    28:24;34:2,12;
    44:18
**lottery (1)**
    25:1

**M**

**main (1)**
    5:10
**maintain (1)**
    31:5
**makes (2)**
    14:5;35:13
**making (2)**
    31:21;43:23
**manage (1)**
    20:12
**manageable (1)**
    39:10
**managing (1)**
    8:18
**manipulation (1)**
    38:25
**manner (2)**
    33:4;36:6
**many (8)**
    12:23;13:14;17:5,
    5;26:16;41:11,11;
    42:10
**March (1)**
    46:10
**Mark (1)**
    17:25
**market (24)**
    6:15,22;12:4;
    14:15;15:7;25:11,
    13;26:16,20;27:11;
    31:8;33:12,13;

36:13;37:3;38:25;
    40:10,15;47:17,25,
    25;48:4,11,13
**marketplace (1)**
    27:8
**match (1)**
    21:4
**material (1)**
    17:8
**matter (5)**
    7:20;15:8;16:14;
    22:1,11
**matters (1)**
    17:20
**Matthew (1)**
    19:11
**may (17)**
    6:1,11;8:5;10:10,
    19;11:14;12:9;16:3;
    22:11;26:2,21;
    29:22;34:9;35:1,20;
    41:8;46:13
**maybe (1)**
    43:18
**McGuire (5)**
    19:10,11,12,17,19
**mean (10)**
    18:11;20:17;
    27:18;38:8;39:9;
    40:13;43:6,17;44:1;
    48:10
**meaning (1)**
    22:18
**meant (1)**
    14:23
**mechanic (1)**
    39:10
**mechanical (2)**
    26:23,25
**mechanics (5)**
    13:2,4;21:16;28:2;
    40:18
**mechanism (1)**
    41:13
**memoranda (1)**
    18:17
**memorandum (1)**
    17:4
**merger (1)**
    44:1
**merits (1)**
    16:2
**middle (1)**
    24:5
**might (2)**
    14:20;33:10
**mind (1)**
    38:8
**minimum (1)**
    18:7
**minutes (2)**
    46:19;48:21
**misimpression (1)**

12:3
**missing (1)**
    41:14
**mistaken (1)**
    39:9
**misunderstanding (2)**
    13:18,22
**modified (1)**
    6:21
**moment (4)**
    32:14,18;33:11;
    46:20
**money (7)**
    6:15,21;14:4;15:5;
    25:7;29:12;37:6;
    39:2;40:9;42:14,14;
    47:12
**monkey (1)**
    31:22
**months (1)**
    23:5
**moral (1)**
    31:14
**more (11)**
    6:15;18:12;22:1,
    12;25:1;29:12,21;
    37:12;39:2,2;42:8
**morning (1)**
    13:11
**MOSHE (2)**
    4:8;47:1
**most (1)**
    24:18
**motion (3)**
    5:17;6:9,19
**mouth (1)**
    43:6
**move (3)**
    39:23;46:7,13
**moved (1)**
    46:9
**moves (1)**
    14:17
**moving (1)**
    39:21
**much (3)**
    5:25;25:1;44:25
**multiple (1)**
    37:6
**murky (1)**
    39:17
**must (1)**
    21:22
**mute (1)**
    5:24

**N**

**name (3)**
    11:1;30:1;46:25
**nature (3)**
    7:15,24;34:5
**necessarily (1)**

28:24
**need (9)**
    24:4;28:17;39:18;
    41:24,25,25;42:1,1;
    46:19
**needed (2)**
    40:4,10
**neighbor (1)**
    27:6
**new (1)**
    28:18
**next (2)**
    6:8;29:4
**nickel (1)**
    29:11
**nineteenth (1)**
    38:24
**nobody (1)**
    11:6
**NOLs (1)**
    16:24
**nonpublic (1)**
    40:12
**nontypical (1)**
    21:24
**note (3)**
    7:13;17:4,14
**noted (2)**
    9:2;19:9
**notes (1)**
    48:21
**notice (1)**
    7:14
**noticed (1)**
    7:10
**number (8)**
    5:14,17;6:3,8;
    10:22;11:2;12:12;
    18:4
**nunc (1)**
    8:20

**O**

**object (3)**
    7:22;33:15;45:4
**objected (1)**
    28:5
**objecting (1)**
    29:8
**objection (15)**
    7:19;9:23;12:10;
    13:20;14:12;16:4,4,
    6,7,12,19;17:21;
    19:3;33:16;35:8
**objectionable (1)**
    45:25
**objections (4)**
    7:11;9:12,23;
    10:18
**obligation (2)**
    13:12;23:7
**obliged (4)**

21:21;25:22;
33:20;48:3
**observe (1)**
35:7
**obviously (3)**
5:10;19:3;40:19
**occasions (1)**
42:10
**occur (4)**
11:14;25:2;28:16;
42:23
**October (1)**
7:6
**Oddly (1)**
39:24
**offense (1)**
35:17
**offer (1)**
44:16
**Office (1)**
17:15
**officers (3)**
47:6,7,9
**Often (3)**
40:25;42:13;43:20
**oil (1)**
24:23
**once (2)**
37:12;46:11
**one (24)**
10:19;12:17;
15:20;18:6;23:6;
24:17,21;26:6,12,16,
21;28:17;30:10,20;
32:18;34:16;35:20;
37:1,2;38:16;45:7;
46:3,8;47:16
**ones (1)**
47:10
**only (11)**
10:11;11:12;12:7,
15;13:21;18:6;31:2;
37:14,14;39:1;40:5
**onto (3)**
27:15;31:12;33:17
**open (1)**
38:13
**operated (1)**
14:23
**operating (1)**
6:18
**Operator (4)**
5:20,20,21,23
**opportunity (8)**
7:21,22;9:14;
19:14,23;23:19;
36:16;48:21
**opposed (1)**
24:12
**opposite (1)**
39:25
**opposition (2)**
7:23;18:19

**option (1)**
14:20
**order (11)**
5:18;6:5,9;10:16;
22:5;26:14;30:23;
31:15;42:23;43:10;
46:11
**others (1)**
11:8
**ought (1)**
40:14
**out (28)**
6:17;7:10;15:6,10;
20:19;21:10;22:7;
25:12;26:2,8,10,11;
27:16;28:18;29:1,9;
33:4;35:25;36:15;
37:7;39:16;40:9,12;
41:4,22;45:14;47:4,
16
**over (8)**
18:2,4;26:17;
27:16;29:4;33:4;
36:17;47:21
**overlay (2)**
29:17;36:13
**overruled (1)**
33:17
**own (2)**
7:5;19:6
**owner (1)**
27:16
**owners (2)**
22:19,20

**P**

**page (1)**
11:10
**paid (15)**
21:7;22:18,19,23,
24;24:10;25:17;
26:16,19,21;27:16;
30:11;33:3,4;40:2
**part (9)**
11:13,16;13:21;
19:1;33:5;35:9;43:2,
3;46:12
**participant (2)**
48:4,14
**participants (1)**
34:5
**particularly (1)**
20:19
**parties (9)**
7:17;10:22;23:12;
24:9,14;25:11,13;
36:7,25
**partners (1)**
7:16
**party (10)**
9:9;10:14;26:17,
17,19,19,21;31:8;

33:19;36:12
**Passover (1)**
40:22
**path (1)**
24:25
**Pause (1)**
32:21
**pay (6)**
12:19;24:11;
26:13;29:12;31:3;
32:11
**paying (2)**
15:9;46:3
**payment (5)**
11:13,16;27:14;
36:1,5
**payments (1)**
15:9
**pendency (1)**
11:21
**people (19)**
11:5;14:16,21;
15:10;21:18;29:6;
34:3;37:4;40:11;
41:22;43:3;44:19,
19;45:3,9,13;47:7,9,
17
**per (1)**
19:6
**percent (9)**
12:11;14:19;21:5;
29:4,11,13,14;37:5;
45:22
**perhaps (3)**
21:10;29:18;42:8
**period (2)**
7:7;18:3
**periods (1)**
5:18
**permit (1)**
6:21
**perplexed (1)**
41:9
**person (2)**
31:4,4
**personal (1)**
45:4
**Peter (3)**
5:7;8:14,22
**Pfizer (4)**
6:12;38:20,20,21
**ph (1)**
15:2
**phrase (1)**
38:8
**pile (2)**
13:23;40:7
**pinks (1)**
13:10
**pivoting (1)**
20:5
**place (6)**
20:5;25:14;27:25;

28:7;30:25;47:16
**placed (1)**
10:5
**plan (42)**
5:12;8:11;9:17;
11:11,17,24;12:20,
24;14:3;16:10,15;
17:12;18:3;20:4,10,
14;21:3,9,21,22,25;
22:7,12,15;23:17,22;
24:1,9;26:3;28:4,13,
16,18;29:3;32:1,6;
36:5,14;38:15;42:9;
47:24;48:17
**planner (1)**
8:22
**planning (1)**
8:23
**plans (2)**
41:1;45:3
**platform (3)**
32:25;33:1,2
**platforms (1)**
23:13
**play (3)**
21:10;45:5;47:18
**playing (1)**
15:3
**plays (2)**
14:15;26:8
**Please (4)**
5:3;12:20;29:24;
42:18
**pleased (1)**
18:23
**PM (1)**
48:24
**podium (2)**
8:11;43:20
**point (8)**
13:3;18:14;27:18;
35:20,23;44:12,24;
47:4
**pointed (2)**
20:19;37:7
**pointing (1)**
23:3
**points (1)**
45:17
**poses (1)**
11:22
**position (7)**
14:6;17:20;39:18,
23,24;40:14;43:3
**possible (1)**
14:4
**post- (1)**
39:7
**post-denial (1)**
47:14
**potential (2)**
33:25;36:13
**potentially (4)**

23:18;31:6;36:2,2
**powder (1)**
34:7
**pox (1)**
38:9
**practical (1)**
16:14
**practice (5)**
15:19;16:5,8;
18:22;21:17
**precedent (2)**
48:16,16
**precisely (1)**
43:25
**predictable (1)**
18:23
**preliminarily (1)**
33:17
**prepack (1)**
24:24
**prepared (3)**
12:24;15:11;26:5
**presented (2)**
7:20;21:16
**presumably (1)**
42:22
**pretty (2)**
31:21;44:25
**price (1)**
47:14
**prior (2)**
17:12;18:12
**priority (1)**
13:23
**private (2)**
14:10;37:20
**PRO (3)**
4:8;8:20;19:15
**probably (1)**
18:11
**problem (6)**
26:25;39:22;40:3,
16;41:20,23
**problems (1)**
39:2
**procedural (1)**
16:6
**proceed (3)**
6:1;16:1;17:9
**proceedings (1)**
48:24
**proceeds (16)**
23:1,14;26:14,16,
19,21;27:14,15;
30:24;31:1,3,5,8,12;
33:3;36:14
**process (9)**
14:3;24:6;27:2;
33:21;35:13,15;
39:9;41:2,24
**profit (1)**
47:7
**promised (1)**

29:15
**promptly (1)**
24:20
**property (1)**
22:20
**proposal (1)**
28:4
**propose (1)**
21:21
**proposed (7)**
20:8;23:16,17;
26:3,3,4;36:14
**proposition (1)**
29:6
**provide (2)**
20:11;36:9
**provides (1)**
29:4
**provision (1)**
30:11
**provisions (2)**
13:19;30:10
**public (2)**
41:16;43:25
**publicly (1)**
24:18
**purchase (3)**
27:22;28:10;30:9
**purchased (5)**
11:14;25:15;27:6;
38:12,13
**purchaser (1)**
36:15
**Purchasers (1)**
11:22
**purple (1)**
17:16
**purposes (2)**
16:16;31:25
**pursuant (1)**
22:20
**put (3)**
39:16;43:6;45:14

**Q**

**Quickly (3)**
5:17;15:10;35:17
**quoted (2)**
12:19;39:2
**quoting (1)**
37:14

**R**

**raised (4)**
16:14;17:12;
41:10,10
**Randy (2)**
8:24;9:19
**range (1)**
45:20
**rapper (1)**

39:2
**rare (1)**
21:23
**reach (1)**
30:22
**reached (1)**
6:18
**read (10)**
25:20,22;26:7;
38:13;42:11,11,12;
48:14,15,16
**ready (1)**
17:9
**real (1)**
47:7
**realize (1)**
41:7
**really (8)**
11:5;14:7;15:8,14;
18:3;26:14;34:5;
35:12
**reasons (1)**
12:8
**recall (1)**
6:11
**receivables (1)**
15:9
**receive (11)**
9:22,24;11:23;
13:8;10;22:9;27:14;
31:3,3;38:15;48:7
**received (2)**
9:5,20
**recently (2)**
24:21,22
**recess (2)**
46:20;48:22
**recognize (1)**
24:4
**record (55)**
11:12;13:5,16;
14:2,18;16:17;17:2,
25;19:6;20:8,12;
21:2;22:3,8,17,19,
23;23:4,16,17;24:1,
3,8;26:4;27:3;28:2;
30:8,20;31:2,11,14,
19,23,24;32:5;33:5;
34:8;39:7,13,21,23;
40:1,5,5,7,20;42:19;
46:3,7,9,9,10,13;
47:8;48:19
**record-date (1)**
36:5
**recoup (1)**
31:8
**recoveries (1)**
29:5
**refined (1)**
16:20
**reflected (1)**
17:14
**register (2)**

18:25;19:2
**related (2)**
11:5;18:20
**relates (4)**
13:4;16:18,23;
31:16
**relationship (4)**
23:9,10,11,12
**relevant (1)**
34:14
**relief (3)**
6:25;7:15,24
**remarkable (1)**
44:14
**remember (1)**
44:11
**reminded (1)**
42:10
**remove (1)**
35:25
**Reorg (1)**
41:19
**reorganization (1)**
28:11
**reorganizations (2)**
13:24;41:17
**repeated (1)**
11:19
**reply (1)**
45:15
**represented (2)**
7:16;33:20
**represents (1)**
8:3
**request (5)**
7:11;9:17;16:9;
33:10;35:4
**requested (2)**
7:24;28:22
**requesting (1)**
29:20
**requests (1)**
46:7
**require (2)**
12:9;23:14
**requires (2)**
20:6;21:5
**reschedule (1)**
48:19
**research (1)**
48:14
**resolution (1)**
7:25
**resolved (2)**
10:15;18:7
**respect (7)**
16:13;17:10,20;
18:7;31:9;33:13;
48:11
**respond (1)**
7:22
**response (3)**
18:5;32:3;37:8

**responsibility (1)**
35:10
**result (3)**
33:8;43:23;46:16
**retain (1)**
31:5
**retention (1)**
8:20
**retract (1)**
39:15
**return (2)**
46:19;48:22
**returned (1)**
7:4
**reverse (1)**
44:1
**review (1)**
48:21
**reviewed (2)**
9:5;10:1
**reward (1)**
38:6
**Richards (1)**
5:6
**ridiculous (1)**
40:13
**Right (49)**
7:2;9:8;10:10;
14:10;16:25;17:3;
18:14;19:9;20:4,15,
23;21:1;22:6,25;
23:2,15;24:14;25:10,
12,19;26:9;27:19,20;
29:2,5,13,17;30:11,
24;31:4;32:23;33:8;
35:16;37:20;38:1,11,
20;39:5,6;40:9;
41:18,22,23;44:11;
45:25;46:4,16,19;
48:20
**rightful (2)**
27:16;32:11
**rights (2)**
26:21;30:25
**rise (1)**
5:2
**risk (3)**
11:22;26:7;47:9
**robust (3)**
25:4;34:23;43:24
**room (1)**
29:10
**ROTH (3)**
4:2;19:14,22
**routine (1)**
22:1
**rule (12)**
13:23;19:4;20:6;
21:4,9;23:17;24:12;
27:25;42:2;45:13;
47:18;48:22
**rules (35)**
12:8;14:11;20:3,4,

10;22:18,21;23:13,
14,18,20;24:14;
25:14,15,15;26:8;
27:10,12;28:7,9;
31:9,9;32:12;33:1,2,
5;36:6,8,13,18;
37:19;46:11,17;
47:18;48:11
**ruling (3)**
26:14;40:1;47:11
**run (2)**
21:8;41:1

**S**

**Sadly (1)**
29:5
**sale (2)**
15:6;43:24
**Same (5)**
22:22;42:16;43:5,
8,14
**SARFATY (7)**
4:8;46:21,23,25;
47:1,4;48:8
**satisfied (1)**
8:1
**satisfy (1)**
7:1
**saving (1)**
42:12
**saw (1)**
36:13
**saying (10)**
14:21;21:2;26:18;
30:23;31:1;32:4;
39:2,6,13;42:17
**scenario (1)**
23:20
**SCHULTE (3)**
4:2;19:13,22
**SE (1)**
4:8
**seat (1)**
35:6
**seated (1)**
5:3
**SEC (1)**
12:20
**second (5)**
21:15;22:3;36:16;
47:17;48:13
**Secondly (1)**
45:25
**seconds (1)**
35:2
**securities (7)**
13:25;24:19;25:5,
23;28:10;30:3;45:22
**security (6)**
21:6,6;27:21;
29:14;38:14;48:7
**seeing (1)**

27:12
**seem (2)**
25:6;44:13
**seemed (1)**
7:17
**seems (5)**
13:17;28:11;
29:20;31:13;41:9
**sell (2)**
37:3;47:18
**seller (3)**
22:21,24;27:10
**sellers (2)**
32:24;33:13
**selling (3)**
25:11;27:11,14
**send (5)**
30:18;37:18;40:9,
18;41:22
**sending (1)**
41:25
**sends (1)**
22:7
**senior (2)**
8:18,22
**sense (1)**
7:18
**sent (1)**
9:24
**separate (2)**
23:9;38:11
**September (1)**
13:11
**set (22)**
10:23;12:6,13,16;
14:9;20:12;24:4;
30:20;31:11,24;
33:6;37:15,17,21;
39:10;40:4;41:2,25;
42:19;47:18,19;
48:19
**sets (1)**
14:16
**setting (2)**
31:2;39:7
**several (1)**
18:3
**Shabby (1)**
10:13
**shall (1)**
6:25
**Shannon (4)**
5:21,22;43:13;
46:24
**share (1)**
47:13
**shareholder (1)**
13:5
**shareholders (1)**
13:5
**shares (2)**
11:20;27:7
**sharp (1)**

17:16
**shortage (1)**
40:24
**show (1)**
44:22
**sic (1)**
25:16
**side (4)**
14:21;36:25;
38:16,17
**sides (3)**
14:14;45:6,12
**sign (2)**
8:4;32:24,25;33:1
**signed (2)**
42:20;43:10
**significant (2)**
34:24;41:10
**signs (1)**
22:4
**silence (1)**
45:19
**silent (1)**
35:24
**similar (3)**
11:20;12:1;43:25
**simply (1)**
40:17
**single (1)**
42:20
**sits (1)**
29:10
**situation (8)**
21:24;31:6;32:24;
39:16;42:8,16;
43:25;45:24
**situations (2)**
46:1;47:20
**six (2)**
18:13;42:13
**smoke (1)**
35:13
**softball (1)**
39:5
**sold (2)**
47:9,13
**somebody (3)**
27:22;29:10;43:7
**somebody's (3)**
27:21;28:13;43:6
**somehow (1)**
13:18
**someone (1)**
46:3
**somewhat (1)**
42:2
**soon (1)**
14:4
**sophisticated (1)**
15:2
**sorry (4)**
30:1;35:20;46:21,
25

**sort (4)**
16:19;27:19,23;
43:19
**sought (1)**
7:15
**sounds (2)**
33:21;34:9
**speak (1)**
47:1
**Specialists (1)**
8:19
**specific (3)**
12:12;17:7;32:3
**specifically (3)**
20:11;23:23;46:2
**specifics (1)**
39:4
**speculate (3)**
12:7,15;13:21
**speculating (1)**
27:13
**speculation (2)**
25:5;36:12
**speculative (1)**
11:22
**speculators (3)**
25:11;36:12;45:5
**spent (2)**
38:1,3
**square (3)**
21:9;25:19;28:17
**squared (1)**
16:19
**squarely (2)**
16:16;26:11
**squeeze (1)**
29:9
**stake (1)**
20:14
**stakeholders (2)**
13:9;35:10
**stand (5)**
34:22;35:17;
46:20;48:12,22
**standard (1)**
41:2
**standing (3)**
16:3;19:3,7
**stands (3)**
34:3;43:20;47:12
**state (1)**
22:17
**statement (25)**
5:11;8:10;9:18;
16:10,15;17:11;
18:17;20:5,10;21:22,
25;22:2,5,12;23:22;
26:3;27:12;28:1,18,
21,23;42:9,18,20;
46:8
**States (3)**
17:16,25;25:16
**stay (3)**

6:20;7:1;35:24
**Steele (1)**
5:6
**step (3)**
24:15;26:12;30:21
**stepped (1)**
30:20
**stick (1)**
42:1
**still (1)**
29:20
**stip (1)**
8:4
**stipulation (4)**
6:10,18;7:12;8:2
**stock (20)**
11:15,21,23;
13:10;14:7,18,19;
24:20;27:6,14;37:3,
5;38:23;39:19;41:4;
43:25;47:8,17;48:2,6
**stockholder (1)**
19:5
**stockholders (1)**
11:12
**stocks (1)**
42:22
**stop (1)**
39:19
**string (1)**
21:10
**struggling (1)**
29:16
**studied (1)**
21:14
**stuff (2)**
41:25;44:2
**subject (8)**
9:8,13;12:9;28:6;
40:19;45:22;46:13,
14
**submission (3)**
25:20,23;38:13
**submitted (1)**
9:3
**subsequent (5)**
11:15,17;39:10,11,
11
**subsequently (1)**
12:1
**Subsidiary (1)**
8:16
**substantial (1)**
11:22
**substantive (1)**
18:6
**successful (2)**
15:5,6
**sudden (1)**
14:18
**support (2)**
9:16,20
**supported (1)**

6:13
**supposed (1)**
47:8
**supposedly (1)**
47:14
**sure (16)**
5:24;8:6;9:10;
10:12;13:3;15:15;
16:8,18;17:8;32:17;
34:10,14,15;35:22;
42:5;45:18
**surprise (1)**
10:8
**surprised (2)**
44:21;45:1
**surprisingly (1)**
15:6
**switched (1)**
39:23
**sympathy (1)**
14:8
**system (1)**
31:25

---

## T

**table (1)**
27:7
**talk (5)**
32:14;36:11;38:5,
6;46:3
**talked (4)**
11:6;40:15,16;
44:19
**talking (6)**
7:6;12:4;13:19;
31:17;45:4;46:2
**tangentially (1)**
41:7
**TBD (1)**
12:19
**teeth (1)**
25:25
**TELEPHONICALLY (1)**
4:8
**telling (3)**
31:16;37:23;40:18
**ten (1)**
42:13
**tension (1)**
24:5
**termed (1)**
6:22
**terms (3)**
6:20;7:5;16:3
**terrible (1)**
39:22
**Terrific (2)**
19:19;28:22
**testimony (2)**
33:22;34:9
**theory (2)**
22:1;25:7

DNIB UNWIND, INC.
(F/K/A BIND THERAPEUTICS, INC.), et al

**thereto (1)**
18:20
**Third (2)**
40:2;46:6
**Thomson (1)**
8:22
**though (3)**
11:7;16:7;26:24
**thought (2)**
25:21;40:6
**times (2)**
21:11;26:16
**title (1)**
30:13
**today (13)**
5:10;8:17;16:16;
19:13;20:3,7;23:22;
24:1;38:17;42:18,
21;44:18;45:7
**together (1)**
21:25
**told (1)**
47:1
**took (3)**
11:2;36:14;40:14
**top (1)**
29:17
**topic (1)**
38:5
**towards (1)**
36:22
**trade (11)**
22:21,22;29:25;
30:7,9,25;31:9;
32:24,25,25;33:3
**traded (2)**
20:7;24:18
**traders (2)**
27:3;29:3
**trades (3)**
28:6;31:10;33:12
**trading (14)**
11:20;15:8;22:11;
23:2,5,13;25:4;27:1,
2;33:13;39:19;
40:10;41:22;42:22
**traditional (1)**
22:13
**transaction (1)**
43:22
**transition (1)**
6:17
**travel (1)**
25:17
**traveling (1)**
21:25
**travels (2)**
21:6;23:10
**tried (2)**
12:4;39:22
**true (1)**
41:16
**Trump (9)**

20:25;23:18,19;
33:8;36:4;39:22,25;
41:17;46:6
**Trustee (3)**
17:16,20;18:1
**try (1)**
31:7
**trying (5)**
17:8;28:20;37:21;
40:11;47:15
**tunc (1)**
8:20
**turn (6)**
16:4,7,13;18:19;
27:15;36:17
**turned (3)**
26:17;30:12;33:4
**turnover (1)**
30:10
**twenty-five (2)**
21:5;45:21
**twice (1)**
39:23
**two (9)**
18:12;24:5;29:4,
11,13,14;34:16;
38:11;46:7
**two-step (2)**
22:12,13

**U**

**ultimate (1)**
24:10
**ultimately (3)**
11:2;31:12;37:15
**uncontroverted (1)**
18:18
**under (6)**
11:11,24;13:12;
21:17;37:20;39:8
**underlying (1)**
36:6
**understood (1)**
7:14
**unequivocally (1)**
25:24
**unique (1)**
43:22
**unit (1)**
37:15
**United (2)**
17:15,25
**unjustly (1)**
36:16
**unless (1)**
7:11
**unsecured (1)**
29:1
**unusual (2)**
24:23;29:6
**Unwind (1)**
8:15

**up (12)**
7:8;12:1;14:2;
15:21;32:24,25;
34:20,21;41:23;
43:19;44:22;46:16
**upon (1)**
7:3
**usually (1)**
23:9

**V**

**value (4)**
14:20;21:6;45:21;
48:7
**victim (1)**
44:1
**view (3)**
13:3;15:3;26:9
**violated (1)**
13:18
**violates (1)**
48:11
**voiced (2)**
13:20;14:11
**vote (4)**
22:9,15;24:2,9
**votes (4)**
24:2,2,3;32:6
**voting (1)**
28:3

**W**

**wacky (1)**
43:20
**wants (1)**
14:11
**warrant (1)**
10:14
**warranted (1)**
8:3
**warrants (1)**
10:14
**Watkins (3)**
5:7;8:15;44:8
**way (9)**
20:24;22:10;25:7;
36:10;37:23;39:21;
40:5;45:1,12
**ways (1)**
38:7
**Wednesday (1)**
9:23
**week (2)**
22:3;42:17
**weeks (3)**
18:3,12;42:13
**Welcome (2)**
5:8;19:20
**what's (3)**
34:13;41:14;45:25
**wheat (1)**

17:9
**Whereupon (1)**
48:24
**whistles (1)**
30:15
**white (1)**
37:1
**whole (2)**
11:8;15:13
**who's (6)**
8:18;20:14;22:15;
24:1;27:22;31:11
**willing (1)**
27:22
**wind (1)**
34:21
**winners (1)**
14:25
**winnowing (1)**
17:9
**wins (1)**
43:12
**wiped (1)**
41:4
**wish (3)**
18:15;45:15;46:18
**wishes (3)**
7:21;9:11;17:10
**withdraw (1)**
35:3
**withdrawn (1)**
28:5
**within (1)**
21:17
**without (2)**
24:10;31:23
**witness (1)**
34:21
**won (1)**
38:19
**words (1)**
43:6
**work (4)**
26:10;31:25;39:8;
40:15
**works (3)**
20:23;22:10;39:6
**worth (1)**
14:7
**worthless (1)**
38:15
**wrapping (1)**
7:8
**wrestling (1)**
43:12
**written (3)**
12:24;20:18;48:12
**wrong (3)**
27:4;31:4,4
**wrote (2)**
44:20;48:9

**Y**

**year (1)**
7:6
**years (1)**
29:4
**Yep (3)**
21:12;30:14;37:9
**yesterday (2)**
10:3;20:7

**Z**

**ZABEL (3)**
4:2;19:14,22

**1**

**1 (1)**
5:17
**10,000 (1)**
27:7
**10-Q (5)**
11:9,19,25;14:5;
39:15
**11 (3)**
5:12;11:21;25:16
**11140b1 (1)**
20:6
**11142b2 (1)**
45:20
**111642b (1)**
25:16
**1123 (1)**
17:5
**1129a (1)**
17:5
**15th (2)**
11:9,25
**16,000 (1)**
6:23
**1st (2)**
8:20;13:11

**2**

**2 (1)**
6:9
**2:12 (1)**
48:24
**2016 (3)**
11:12,15,23
**20th (1)**
46:14
**28th (1)**
46:10

**3**

**3 (1)**
5:14
**30 (4)**

11:15,23;14:1;
40:9
**3017 (2)**
21:9;22:4
**30th (9)**
11:12;12:1;14:7;
20:7;22:16;24:11;
26:14;30:8,8
**31st (5)**
12:18;13:11;
25:25;38:14,18

## 4

**4 (1)**
6:3
**480,000 (1)**
6:14

## 5

**5 (1)**
29:5
**559,000 (1)**
6:16
**5th (2)**
42:18,19

## 6

**6 (1)**
11:10

## 8

**8/30 (3)**
13:7,8;25:12
**8/31 (1)**
13:6
**8-K (6)**
12:2;14:5;24:13;
25:12;33:14;35:25

## 9

**9th (2)**
46:9,10